1  Alan J. Friedman - Bar No. 132580
   Gary A. Pemberton - Bar No. 126159
2  **SHULMAN BASTIAN FRIEDMAN & BUI LLP**
   100 Spectrum Center Drive, Suite 600
3  Irvine, California 92618
   Telephone: (949) 340-3400
4  Facsimile: (949) 340-3000
   Email: AFriedman@shulmanbastian.com
5         GPemberton@shulmanbastian.com

6  Frank C. Quesada - Florida Bar No. 29411
   Robert Strongarone - Florida Bar No. 118931
7  Aida M. Landa - Florida Bar No. 136451
   **MSP RECOVERY LAW FIRM**
8  2701 S. Le Jeune Road, 10th Floor
   Coral Gables, Florida 33134
9  Telephone: (305) 614-2222
   Email: fquesada@msprecoverylawfirm.com
10        rstrongarone@msprecoverylawfirm.com
          alanda@msprecoverylawfirm.com
11 [*Pro Hac Vice* Applications Pending]

12 Attorneys for MSP RECOVERY CLAIMS,
   SERIES LLC, a Delaware Series Limited
13 Liability Company; MSPA CLAIMS 1, LLC, a
   Florida Limited Liability Company; MAO-MSO
14 Recovery II LLC, a Delaware Series Limited
   Liability Company; and MSP RECOVERY
15 CLAIMS SERIES 44, LLC, a Delaware Series
   Limited Liability Company

16

17                **UNITED STATES BANKRUPTCY COURT**

18        **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

19

| 20 | In re | Case Nos. 2:02-bk-14216-BB & LA-04-35876-BB |
|----|-------|---------------------------------------------|
| 21 | **J.T. THORPE, INC.,** | [Jointly Administered Under Case No. LA-02-14216-BB] |
| 22 | Debtor. | |
| 23 | MSP RECOVERY CLAIMS, SERIES LLC, a Delaware Series Limited Liability Company; MSPA CLAIMS 1, LLC, a Florida Limited Liability Company; MAO-MSO RECOVERY II LLC, SERIES PMPI, a Segregated Series of MAO-MSO Recovery II LLC, a Delaware Series Limited Liability Company; and MSP RECOVERY CLAIMS SERIES 44, LLC, a Delaware Series Limited Liability Company, | Chapter 11 |
| 24 | | |
| 25 | | Adv. No. |
| 26 | | **PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |
| 27 | | |
| 28 | | |

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1

1 |   | Plaintiffs,

2 |   |       vs.

3 |   | THE J.T. THORPE SETTLEMENT TRUST, a Nevada Trust; JOHN F. LUIKART, Co-Trustee of the J.T. Thorpe Settlement Trust; SANDRA R. HERNANDEZ, M.D., Co-Trustee of the J.T. Thorpe Settlement Trust.

6 |   | Defendants.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1

2

Plaintiffs MSP Recovery Claims, Series LLC ("MSPRC"), MSPA Claims 1, LLC ("MSPA"), MAO-MSO Recovery II LLC, Series PMPI ("MAO-MSO"), and MSP Recovery Claims Series 44, LLC ("Series 44") (collectively the "Plaintiffs") bring this action for declaratory relief and damages against Defendants The J.T. Thorpe Settlement Trust, a Nevada Trust (the "Trust"), John F. Luikart, not individually, but solely as Co-Trustee of the Trust, and Sandra R. Hernandez, M.D., not individually, but solely as Co-Trustee of the Trust (collectively the "Co-Trustees") and allege the following:

## I.    JURISDICTION AND VENUE

1.    This adversary proceeding arises in and relates to the jointly administered Chapter 11 bankruptcy cases of J.T. Thorpe, Inc., Thorpe Holding Co., Inc. and Thorpe Technologies, Inc. (collectively, the "Tortfeasors") which are presently pending before the United States Bankruptcy Court for the Central District of California, Los Angeles Division, Jointly Administered Under Bankruptcy Case No. 2:02-bk-14216-BB. This Court has jurisdiction to adjudicate the issues raised in this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and exclusive jurisdiction over this action under 11 U.S.C. § 524(g)(2)(A) as this proceeding involves the validity, application, construction or modification of an injunction that was entered by the United States Bankruptcy Court for the Central District of California pursuant to 11 U.S.C. § 524(g). This Court has subject matter jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure. An actual justiciable controversy exists between Plaintiffs, on the one hand, and the Trust and the Co-Trustees (collectively the "Defendants"), on the other hand, within the meaning of 28 U.S.C. § 2201 regarding whether the Trust is a primary plan within the meaning of the Medicare Secondary Payer provisions of the Medicare Act[1] and whether Defendants have a duty to report the Trust's primary payer responsibility and provide information related to Medicare claims and claimants to Plaintiffs pursuant to federal law and regulations. Additionally, this Court has federal question jurisdiction over this action under

---

[1] The Medicare Secondary Payer provisions are set forth at 42 U.S.C. §1395y(b), as amended. The Centers for Medicare and Medicaid Services ("CMS") has issued regulations implementing the statute which are located Title 42 of the Code of Federal Regulations. The MSP statutes and regulation are herein collectively referred to as the "MSP Law."

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                    3

28 U.S.C. § 1331. Jurisdiction is also proper under 42 U.S.C. § 1395y(b)(3)(A). Finally, pursuant to this Court's Order Confirming First Amended Plan of Reorganization Dated August 5, 2005 and Granting Relief (Doc. 1455), the Bankruptcy Court retains "the most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out . . ."

2.     Pursuant to 28 U.S.C. § 1409, venue is proper in this district.

3.     This Complaint involves core proceedings pursuant to subsections (A) and (O) of 28 U.S.C. § 157(b)(2). To the extent that this may be a non-core proceeding, Plaintiffs consent to the entry of final orders or judgment by the Bankruptcy Court.

## II.    INTRODUCTION

4.     Medicare providers suffer staggering financial losses when treating asbestos exposure related injuries, depleting the dwindling Medicare Trust Fund. Meanwhile, asbestos personal injury trusts have paid billions in settlement funds to countless asbestos claimants. These trusts routinely and consistently shirk reporting and reimbursement obligations under the law. The Trust, administered by the Co-Trustees, is one of over 60 trusts Plaintiffs identified as failing to comply with federal law and regulations, effectively shifting the burden of treating asbestos-related illnesses to Medicare and other government funded healthcare programs.

5.     Plaintiffs bring this action seeking declaratory relief and money damages pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiffs seek a determination that the Trust is a primary plan pursuant to the MSP Law and that the Co-Trustees have a duty to report the Trust's primary payer responsibility and provide information related to Medicare claims and claimants to Plaintiffs pursuant to federal law and regulations.

6.     Additionally, Plaintiffs bring this action to enforce their assignors' rights as "secondary payers" under the MSP Law to recover from the Trust, a "primary payer" under the MSP Law, double the amount of the primary payment or appropriate reimbursement that the Trust, as the primary payer, failed to provide plus interest.

/ / /

/ / /

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                4

7.     Asbestos is a naturally occurring mineral used by hundreds of manufacturers in a wide variety of products including insulation, gaskets, building materials, and automotive parts. Asbestos exposure is dangerous because inhaled or ingested asbestos dust becomes permanently trapped in the body. Mesothelioma, a rare and aggressive cancer, is almost exclusively caused by asbestos exposure; however, asbestos exposure causes other forms of cancer and progressive lung disease as well.[2] On average, symptoms of disease resulting from asbestos exposure typically begin manifesting between 40 and 51 years after asbestos exposure, and 68 to 74 years of age.

8.     After the link between asbestos exposure and cancer was discovered in the 1960s, companies that mined asbestos and manufactured asbestos-containing products faced a series of lawsuits for personal injury and wrongful death claims.

9.     Asbestos companies could not afford the jury awards and settlements resulting from these lawsuits, opting instead to file bankruptcy to reduce or limit liability. In many cases, asbestos trust funds were established and amply funded to settle current and future claims. Most asbestos companies, including the Tortfeasors, sought bankruptcy protection employing the use of a personal injury trust funds to settle asbestos-related illness claims.

10.    When asbestos trusts settle with claimants who are Medicare beneficiaries, federal law requires their trustees to provide notice of the settlement and to reimburse conditional payments made by Medicare providers on behalf of the claimant for the medical treatment of asbestos-related illnesses. When asbestos trusts pay settlements directly to asbestos claimants (or claimants' counsel) without first accounting for Medicare providers' rights, Medicare's ability to enforce its rights is impaired or extinguished. Additionally, the MSP Law imposes penalties when primary plans pay settlements directly to claimants without reimbursing Medicare providers for medical costs covered under the same program. Penalties for non-compliance include double damages and interest charges.

/ / /

/ / /

---

[2] Mesothelioma, pneumoconiosis, progressive lung disease, and other cancers and illnesses are collectively referred to herein as "asbestos-related illnesses."

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1

5

11.    Plaintiffs hold assigned rights to reimbursement, including those recoverable pursuant to the MSP Law, through assignments from Medicare Advantage organizations ("MAOs"), full-risk organizations such as Management Service Organizations and Independent Physician Associations, and other Medicare first-tier, downstream, and related entities (collectively, "MA Plans" or the "Assignors"), all of which act as third-party payers, providing Medicare benefits to their enrolled beneficiaries ("Enrollees"). The Assignors irrevocably assigned to Plaintiffs all of the Assignors' rights to pursue and recover monies related to payments made by the Assignors for including, among other things, part or all of their Enrollees' treatment for asbestos-related illnesses (the "Assignments").

12.    The Assignors provided medical benefits by treating or paying for the treatment of their Enrollees' asbestos-related illnesses. Pursuant to the Assignments and federal law, when those Enrollees receive settlement funds from an asbestos trust, Plaintiffs have a right to reimbursement of the billed amounts for the services or costs incurred by the Assignors on behalf of Enrollees. The trusts historically have and continue to fail to report settlements or reimburse health plans, including the Assignors, as required by law.

13.    Although some asbestos-related claims are pursued in the tort system, the majority are submitted to asbestos bankruptcy trusts, completely outside the reach of Plaintiffs, their Assignors, the public, and even the Department of Justice ("DOJ").

14.    Defendants paid, and continue to pay, settlements to claimants that were injured as a result of asbestos exposure. Defendants fail to properly report the Trust's primary payer responsibility or provide information relating to settlements to Plaintiffs or their Assignors as required by federal law and regulations.

15.    In this action, Plaintiffs seek all available relief including, but not limited to: 1) declaratory relief in the form of an order stating that the Trust is a primary plan as defined by federal law and regulations, and that Plaintiffs are entitled to the disclosure of the identity of each Enrollee who received settlement funds from the Trust, either through the court system or other administrative processes; 2) double the amount of the primary payment or appropriate reimbursement that the Trust, as the primary payer, failed to provide plus interest.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                          6

III.    **PARTIES**

*__Plaintiffs__*

16.    Plaintiffs have been assigned all legal rights of recovery and reimbursement for medical items and services provided by the Assignors that administer Medicare benefits for Medicare beneficiaries under Medicare Part C and/or Medicare Part D, whether said rights arise from: (a) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements; and/or (b) state and federal laws that provide for the reimbursement of payments made by the assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

17.    The Assignors irrevocably assigned, transferred, conveyed, set over, and delivered to Plaintiffs, any and all of Assignors' right, title, ownership, and interest in and to any and all legal or equitable rights to pursue and recover monies related to the claims that Assignors paid for including, among other things, part or all of their Enrollees' treatment for asbestos-related illnesses, conferring standing on Plaintiffs to bring this lawsuit. Plaintiffs' assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

18.    The Assignors provided payment for the medical items and services related to the treatment of injuries caused as a result of their Enrollees' exposure to asbestos products manufactured by the Tortfeasors throughout the United States.

**__MSPRC__**

19.    MSPRC is a Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more designated Series.

20.    MSPRC has established various designated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other Company assets, and in order to account for and associate certain assets with a certain particular series. Pursuant to MSPRC's limited liability agreement, all designated series form a part of MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                    7

1   the right to sue on behalf of each series and pursue any and all rights, benefits, and causes of action

2   arising from assignments to a series. Any claim or suit may be brought by MSPRC in its own name

3   or it may elect to bring suit in the name of its designated series.

4          21.    MSPRC's limited liability agreement provides that any rights and benefits arising

5   from assignments to its series shall belong to MSPRC.

6          22.    Certain series of MSPRC has executed irrevocable assignments of any and all rights

7   to recover payments made on behalf of their Assignors' health plan members and enrollees. These

8   assignments authorize the series and MSPRC, through its operating agreement, to pursue and

9   enforce all legal rights of recovery and reimbursement for health care services and Medicare

10   benefits, including payments or services rendered under Medicare to treat asbestos-related illnesses.

11                   ***MSPA***

12          23.    MSPA is a limited liability company that is duly organized, validly existing, and in

13   good standing under the laws of Florida, with its principal place of business in Coral Gables, Florida.

14          24.    MSPA has executed irrevocable assignments of any and all rights to recover

15   payments made on behalf of its Assignors' health plan members and enrollees. These assignments

16   authorize MSPA to pursue and enforce all legal rights of recovery and reimbursement for health

17   care services and Medicare benefits, including payments or services rendered under Medicare to

18   treat asbestos-related illnesses.

19                 ***MAO-MSO***

20          25.    MAO-MSO is a series limited liability company that is duly organized, validly

21   existing, and in good standing under the laws of Delaware, with its principal place of business

22   located in Cresskill, New Jersey.

23          26.    MAO-MSO has executed irrevocable assignments of any and all rights to recover

24   payments made on behalf of its Assignors' health plan members and enrollees. These assignments

25   authorize MAO-MSO to pursue and enforce all legal rights of recovery and reimbursement for

26   health care services and Medicare benefits, including payments or services rendered under Medicare

27   to treat asbestos-related illnesses.

28   */ / /*

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                      

### *Series 44*

27.    Series 44 is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. Series 44's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Series 44 established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and in order to account for and associate certain assets with a certain particular series.

28.    Series 44 has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Series 44. Series 44 may receive assignments in the name of Series 44 and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Series 44 and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Series 44 retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series.

29.    Certain series of Series 44 has executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' health plan members and enrollees. These assignments authorize the series and Series 44, through its operating agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits, including payments or services rendered under Medicare to treat asbestos-related illnesses.

30.    As assignees of recovery rights from MA Plans that are entitled to payment from primary plans such as Defendant, Plaintiffs "stand in the shoes" of CMS to enforce federal Medicare laws and regulations. 42 C.F.R. § 422.108(f) ("The MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations . . ."); *see also MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1317 (11th Cir.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                    9

1  2019) ("[Medicare Advantage organizations] stand in the shoes of Medicare . . .").

2  ***Defendants***

3       31.    The Trust was established pursuant to the laws of Nevada and was formed pursuant

4  to the First Amended Joint Plan of Reorganization (the "Plan"). The Plan was confirmed by an order

5  of the Bankruptcy Court, dated August 5, 2005, in Bankruptcy Case Number 02-BK-14216, then

6  pending in the United States Bankruptcy Court for the Central District of California, Los Angeles

7  Division. The Trust came into existence on or around June 29, 2006, the effective date of the Plan.

8  The Trust's purpose is to assume the liabilities of the Tortfeasors and their predecessors and

9  successors in interest arising from or relating to asbestos related claims, to use the Trust assets and

10  income to pay the holders of all claims in accordance with the trust agreement, and to otherwise

11  comply with the requirements of a trust set forth in Section 524(g) of the Bankruptcy Code.

12  **IV.   LEGAL FRAMEWORK**

13      **A.  Medicare Generally**

14       32.    Title XVIII of the Social Security Act (the "Medicare Act") creates the Medicare

15  program, a system of federally funded health insurance for people aged 65 and older, and people

16  under 65 suffering from certain specified diseases.

17       33.    CMS administers Medicare, acting under authority delegated by the Medicare Act to

18  the U.S. Department of Health and Human Services.

19       34.    Part A of the Medicare Act, 42 U.S.C. § 1395c, *et seq.*, provides insurance coverage

20  for costs of inpatient hospital and other services. Part A is available without payment of premiums

21  to most persons who paid Medicare payroll taxes prior to becoming Medicare-eligible. Part A

22  generally pays 100% of the cost of covered services after deductibles and co-insurance, up to

23  Medicare coverage limits.

24       35.    Part B of the Medicare Act, 42 U.S.C. § 1395j, *et seq.*, is a voluntary program in

25  which beneficiaries pay premiums to Medicare, and in return Medicare pays the costs of medically

26  necessary outpatient services, such as doctor's office visits and home health care. Generally, Part B

27  covers 80% of the cost of such services after exhaustion of deductibles.

28  / / /

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1

36.     With limited exceptions, each individual eligible for Medicare is entitled to elect to receive benefits (other than pharmacy benefits) through the original Medicare program under Parts A and B, or through enrollment in a Medicare Advantage ("MA") plan under Medicare Part C. *See* 42 U.S.C. § 1395w-21(a)(1). No matter which option beneficiaries choose, Medicare Part A and/or B or Part C, the benefits are Medicare benefits that are governed by Title XVIII and the Medicare regulations promulgated thereunder by CMS.

37.     MA Plans must meet strict qualifying standards to provide Medicare benefits to those Medicare beneficiaries who enroll in their plans. MA Plans must provide all Medicare benefits offered under Parts A and B and may provide additional or "supplemental" benefits such as vision or dental plans. *See* 42 U.S.C. §§ 1395w-21 to 1395v-29.

38.     Pursuant to Title XVIII and CMS Medicare regulations, CMS pays MA Plans, directly or indirectly, and delegates to them the obligation to administer, pay, and assume Medicare's economic risk for the Medicare benefits provided to Part C enrollees. The funds CMS pays MA Plans originate from the Medicare Trust Funds. *See* 42 U.S.C. § 1395w-23(f).

**B. The Medicare Secondary Payer Act**

39.     From its inception through 1980, Medicare generally paid for medical services whether or not the recipient was also covered by another health insurance plan.

40.     In 1980, Congress enacted the MSP Law in response to Medicare's skyrocketing costs. *See generally* 42 U.S.C. § 1395y(b).

41.     The MSP Law provides that when Medicare pays for treatment of an enrollee, and there is also a "primary plan," Medicare's payment is conditional; the primary plan, and any entity that receives payment from a primary plan, must reimburse Medicare for the conditional payment it made.

42.     A primary plan's responsibility for such payment "may be demonstrated by . . . a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii).

/ / /

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

43.     In the event a primary plan fails to timely reimburse a Medicare payer for conditional payments made while in the secondary position, the MSP Law authorizes secondary payers to recover double the amount which the primary plan failed to provide for primary payment or appropriate reimbursement, plus interest. *See* 42 U.S.C. §§ 1395y(b)(3)(A); 42 C.F.R. § 411.24.

44.     A primary plan includes a "liability insurance policy or plan (including a self- insured plan)." 42 U.S.C. § 1395y(b)(2)(A). A "self-insured plan" includes "a business trade or profession . . . if it carries its own risk (whether by a failure to carry insurance, or otherwise), in whole or in part" for payment of medical expenses. *Id.*

45.     The MSP Law and federal regulations require all participants in the tort recovery system to honor the reimbursement rights of Medicare and MA Plans.

## V.     FACTUAL ALLEGATIONS

46.     Thousands of asbestos-related personal injury claims are resolved each year. While some claims are resolved through litigation, most are resolved by submitting claims to asbestos trusts.

47.     More than 100 companies have sought bankruptcy protection as a means of dealing with asbestos-related liabilities. In 1994, the Bankruptcy Code was amended to include specific provisions applicable to asbestos-related bankruptcies. Among the amendments was the addition of § 524(g), which allows the bankruptcy court to issue an injunction channeling most asbestos claims (and future demands) against the debtor and related entities into an asbestos trust. Once an asbestos trust is established, asbestos claimants must seek recovery from the asbestos trust rather than the reorganized debtor or its related entities.

48.     There are presently more than 60 active asbestos trusts in operation. Additional asbestos trusts are scheduled to be established or begin accepting claims within the next 12-18 months. Collectively, these trusts will hold more than $40 billion in assets.

49.     Litigation over personal injuries due to asbestos exposure has been ongoing for more than 40 years. Hundreds of thousands of claims have been filed, and billions of dollars in compensation have been paid.

/ / /

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                  12

50.    From 2004 through 2016, asbestos trusts paid out more than $24 billion, resolving hundreds of thousands of asbestos-related claims.

51.    Specifically, from the Trust's inception through December 31, 2020, the Trust paid out over $167 million on over 5,000 claims.

52.    As Plaintiffs have determined that their Assignors paid nearly one million claims for the treatment of asbestos-related illnesses, the Assignors should have received thousands of notices from the asbestos trusts, including Defendants, as required by federal law; however, they received no notices or reimbursements in violation of the MSP Law.

### *Asbestos Trusts Circumvent the MSP Law by Cloaking Themselves in Opacity*

53.    Third parties, including the DOJ, who examine the operations of asbestos trusts consistently find a lack transparency regarding claimant identities, claim amounts paid, and compliance with the MSP Law.

54.    For example, the RAND Institute for Civil Justice prepared a 2010 report titled Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts (the "RAND Report"). The RAND Report notes that data on important variables, such as the number of claims filed against any asbestos trust, the identity of the individuals filing those claims, and the diseases being claimed and paid, are either incomplete or unavailable.

55.    A 2011 Government Accountability Office ("GAO") report found that, of all the trust documents they reviewed from 2009 and 2010 filings, only one trust published claimant names. U.S. Government Accountability Office, GAO-11-819, Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts 25 (2011) (hereinafter "GAO Report").

56.    The U.S. Chamber Institute for Legal Reform prepared a 2018 report entitled Dubious Distribution: Asbestos Bankruptcy Trust Assets and Compensation ("Dubious Distribution") addressing the lack of trust claimant transparency and dwindling trust funds for bona fide claimants. Specifically, the report acknowledges that "detailed information about individual claims made to and payments made from trusts is limited." The report also highlights legislative efforts to mandate that trust forms and related evidence be disclosed in a timely manner during tort proceedings and to discourage the suppression of evidence as has historically been the case in

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                    13

1   asbestos trust related litigation.

2       57.    Despite these limitations, the RAND Report concluded that asbestos trusts paid some

3   $3.3 billion to approximately 575,000 claimants during the year 2008 alone, and Dubious

4   Distribution reported that asbestos trusts paid out nearly $24 billion between 2004 and 2016.

5       58.    In 2018, the DOJ filed statements in several asbestos trust bankruptcy proceedings,

6   wherein it objected to provisions of proposed bankruptcy plans. The DOJ argued that "the terms of

7   the Trust should permit the United States to monitor when particular individuals have filed claims

8   with or received payment from the Trust." *In re Kaiser Gypsum Co., Inc*., Case No. 16-31602, ECF

9   No. 1150, at 12 (Bankr. W.D.N.C. Sept. 13, 2018). The DOJ further argued:

> Although personally identifiable information and medical information are protected under federal law, the assertion of a tort claim in court is a public act, and claims filed with a judicially established trust pursuant to 11 U.S.C. § 524(g) should be a matter of public record—as would be the case if those claims were pursued in a state court or litigated through the bankruptcy claims process. To the extent that the Debtors propose to prohibit any disclosure of claims information, as certain other asbestos trusts have done, this would be a blunt tool that frustrates the government's visibility into compliance with the MSP Statute and Congress's oversight of the effects of section 524(g). Certain information about claims filed with trusts can be appropriately disclosed while still complying with data privacy obligations. The ability to file claims in secret would also stand in contrast to the obligations of creditors in other chapter 11 cases, where claims become part of the public claims register and evidentiary submissions may be sealed only if such relief is specifically granted by the court pursuant to a legally supported motion under 11 U.S.C. § 107.

18  *Id*. at 13.

19      59.    In a 2017 report, Congress identified problems caused by asbestos trusts claim

20  opacity, specifically as it relates to an increase in the potential for fraud:

> Because the trusts' current confidentiality provisions and practices make data sharing difficult, individual trusts and the trust system as a whole are susceptible to fraud and abuse. The GAO and the non-partisan RAND Corporation . . . both concluded that asbestos bankruptcy trusts are unlikely to identify and decline payment of improper claims, including claims that are supported by 'altered work histories' or allege inconsistent exposure patterns.

25  *See* H.R. Rep. No. 115-18, at 11 (2017).

26      60.    The substantial latency period between asbestos exposure and onset of disease means

27  that claimants may have had many exposures over a long period of time, many of which were in the

28  distant past. The result is that claimants were likely not aware of the injury as it occurred, and

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                    14

1    accordingly, may not be able to specifically identify the responsible tortfeasors.

2        61.    As such, a claimant may file claims with numerous trusts, claiming to have been

3    exposed to or harmed by multiple products or debtors, especially for claims submitted under

4    expedited review. Given the substantial period of time between the filing of an asbestos bankruptcy

5    case and the creation of an asbestos trust, a single claimant may obtain multiple sources for asbestos-

6    related recoveries.

7        62.    Asbestos trusts receive, review, process, and settle asbestos claims pursuant to trust

8    distribution procedures ("TDP") established during the bankruptcy case. Claimants are entitled to

9    recover from an asbestos trust only if they establish the existence of an asbestos-related illness

10   caused by or resulting from exposure to asbestos or an asbestos-containing product of the debtor(s)

11   whose bankruptcy case resulted in the creation of that asbestos trust.

12       63.    This lack of transparency results in three general problems for the Assignors:

13           a.   there is not a complete list of asbestos claimants;

14           b.   the limited information that is available is often erroneous, misleading, and missing
                  vital identifying information; and

15
             c.   the trust claim resolution process has no public disclosure requirement.

16

17   ***The Trust's Claim Processing***

18       64.    The Trust's operating procedures and general activities do not comply with reporting

19   requirements and do not ensure that Medicare conditional payments are reimbursed, as required by

20   the MSP Law.

21       65.    The Trust settles claims pursuant to its TDP, which has been amended five times

22   since its creation at the Trust's inception. To recover from the Trust, asbestos claimants must

23   establish the existence of an asbestos-related illness caused by or resulting from exposure to the

24   Tortfeasor's asbestos-containing product. A true and correct copy of the Trust's TDP is attached

25   hereto as Exhibit A.

26       66.    The Trust provides three avenues for claimants to receive compensation: Case

27   Valuation Matrix ("Matrix"), Independent Review, and Extraordinary Review.

28   / / /

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                    15

a. Under the Matrix, claimants provide some basic qualifying information relating to their medical diagnosis and exposure to asbestos. Claimants who meet the established threshold receive settlements according to a pre-determined compensation formula, which has two main components: (i) a dollar value for each disease type; and (ii) a payment percentage applied to that value. These claims are paid out with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.

b. Independent Review allows some independent review of asbestos claims by the Trust for claimants with claims that do not meet the presumptive medical/exposure criteria for the relevant compensable disease.

c. Extraordinary Review is available for claimants whose asbestos injury is alleged to be primarily caused by the Tortfeasor whose bankruptcy case led to the creation of the Trust. Extraordinary Review of asbestos claims allows claimants to potentially receive more than they would under the Matrix or Independent Review by using a "multiplier," of typically between three and five times the independent review value.

67.      Trust claims are processed based on a first-in-first out "FIFO" basis called the FIFO Processing Queue. The Trust liquidates all Trust claims that meet the presumptive medical/exposure criteria in accordance with the Matrix. Claims that do not meet the presumptive medical/exposure criteria for the relevant compensable disease may undergo the Trust's Individual Review process described in the Matrix. In such a case, notwithstanding that the claim does not meet the presumptive medical/exposure criteria for the relevant compensable disease, the Trust can offer the claimant an amount equal to a standard qualified claim of that compensable disease if the Trust is satisfied that the claimant has presented a claim that would be cognizable, valid, and compensable in the tort system.

68.      The TDP requires claimants to submit a claim form, including, *inter alia*, personal identifying information (name, address, Social Security number, etc.), proof of a medical diagnosis of an asbestos-related illness, and proof of exposure to an asbestos-containing product manufactured, marketed, sold or distributed by the debtor(s).

69.      The Claim Form requires claimants to identify whether the claimant was Medicare eligible, whether any of the medical expenses of the injured party related to the claims have been paid by Medicare, whether any such Medicare payments are continuing, and whether Medicare's lien for such payments has been satisfied by claimant (such as participation in an approved Global Settlement with Medicare). The Claim Form also requires that, if a Medicare lien has been satisfied,

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                             16

1    that the proof of Medicare lien satisfaction be submitted along with the Claim Form.

2        70.    Although the Trust's TDP requires the Trust to obtain Medicare related information,

3    Plaintiffs found no evidence that the Trust reported settlements (or reimbursed conditional

4    payments) as required.

5        71.    Once the Trust processes and approves an asbestos claim, and all necessary

6    paperwork is completed, the Trust sends the settlement funds to the claimant or his or her

7    representative. Notably, the Trust does not notify CMS or the Assignors of the settlement,

8    substantially impairing recovery efforts.

9        72.    The Trust's current process does nothing to further Congress' intent of sustaining

10    Medicare. As alleged herein, Congress implemented the MSP Law and its reporting requirements

11    to extend Medicare's viability; yet asbestos trusts and their trustees, including Defendants, fail to

12    comply with these provisions, causing Medicare to expend resources for items and services for

13    which it is not responsible to pay and for which it is entitled to reimbursement.

14        73.    In an attempt to obtain claimant information, Plaintiffs sent a demand letter to the

15    Trust's General Counsel on May 15, 2020 ("Demand Letter"). A true and correct copy of the

16    Demand Letter is attached hereto as Exhibit B. However, the Trust refused to produce claimant

17    records or otherwise cooperate in any meaningful way. A true and correct copy of the response of

18    the Trust's counsel is attached hereto as Exhibit C.

19        74.    On or about December 9, 2020, in anticipation of filing a motion for examination

20    under Fed. R. Bankr. P. 2004, Plaintiffs' counsel contacted the Trust's counsel to request the

21    claimant information sought and set forth Plaintiffs' legal and factual basis for requesting same. A

22    true and correct copy of Plaintiffs' Counsel's Meet and Confer Letter is attached hereto as Exhibit D.

23    On December 21, 2020, Trust counsel responded with, among other things, conclusory arguments

24    that Plaintiffs' document request seeks documents that are not subject to the MSP Law,[3] that the

25

26

27    ---

[3] 42 C.F.R. § 411.25 is a legislative rule promulgated pursuant to a statutory directive derived from a Medicare Act directive to CMS, and thus has general applicability and legal effect. *Health Ass'n of Am., Inc. v Shalala*, 23 F.3d 412, 422-23 (D.C. Cir. 1994).

28

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                    17

Trust is a Qualified Settlement Fund and not a Responsible Reporting Entity,[4] and that Plaintiffs' document request seeks confidential private information from the Trust without any showing that its clients paid anything for any Trust beneficiary whose asbestos exposure occurred on or after December 5, 1980. A true and correct copy of Trust counsel's response is attached hereto as Exhibit E. On January 13, 2021, Plaintiffs' counsel participated in a "meet and confer" conference call with the Trust counsel. Despite clarifying factual and legal questions posed by the Trust counsel regarding Plaintiffs' entitlement to the requested information, the Trust again refused to comply with Plaintiffs' request.

75.     Despite Trust counsel's dismissive responses, Plaintiffs made yet another attempt to resolve these issues outside of litigation by providing a draft copy of this complaint and allowing ample opportunity to review and consider the nature of Plaintiffs' request and a possibility of resolution. Once again, the Trust provided a dismissive response, this time accompanied by a thinly veiled threat.[5] A true and correct copy of Trust counsel's response is attached hereto as Exhibit F.

76.     To independently identify Trust claimants, Plaintiffs searched dockets, bankruptcy filings, annual reports, and the Trust's website attempting to identify trust claimants. Only names were found (in some limited instances, settlement amounts were provided) and Plaintiffs have no means to determine the accuracy or completeness of the complied list of potential claimant names. With the potential claimant names, Plaintiffs conducted a fuzzy name match[6] against their database of Enrollees to identify Enrollees whose asbestos-related medical expenses appear to have been paid by one or more of the Assignors that were also claimants of the Trust (Enrollees identified as the

---

[4] Determination of the Trust's responsibility as a Required Reporting Entity under 42 U.S.C. § 1395y(b)(8) is completely independent of the Trust's obligations under 42 C.F.R. § 411.25 or 42 U.S.C. 1395y(b)(3)(A).

[5] "I am sure you and your clients are aware both that the Trust's assets are protected by injunctions arising under 11 U.S.C. Section 524(g) against any unauthorized claims and that there are significant consequences for the violation of those injunctions." As Plaintiffs are suing the Trust and the Co-Trustees, in the Court with exclusive jurisdiction over this matter, for their violations of the MSP Law, this threat further demonstrates a material misunderstanding of the laws governing this case.

[6] Fuzzy name matching involves the comparing of data sets (here, first and last names) to identify matches to a given degree of certainty where a positive identification value (such as Social Security number) is unavailable for 100% certain matches.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                        18

1   Trust's claimants will be referred to herein as "Matched Asbestos Claimants").

2      77.     Notwithstanding the foregoing, Plaintiffs' fuzzy name match identified 284 Matched

3   Asbestos Claimants to a certainty of no less than 85%, with 5,764 related claims, whose asbestos-

4   related medical expenses appear to have been paid by one or more of the Assignors.

5   **_The Trust is a Self-Insured Plan and a Primary Plan as Defined by Federal Law_**

6      78.     The Tortfeasors were corporations that were involved in the design, manufacture,

7   distribution, sale, installation, and/or service of products containing asbestos.

8      79.     The Tortfeasors constructed and repaired industrial equipment using refractory

9   materials that contained, among other things, asbestos.

10     80.     Overwhelmed by thousands of asbestos-related claims, the Tortfeasors eventually

11  filed for Chapter 11 bankruptcy protection in 2002.

12     81.     The Plan, confirmed by the Court in 2006, included the creation of the Trust which

13  is an asbestos personal injury trust.

14     82.     The sole purpose of the Trust is to assume the liabilities of the Tortfeasors, their

15  predecessors and successors in interest, for all asbestos personal injury claims, and to use the Trust

16  assets and income to pay claimants in accordance with the trust agreement and the TDP, and to

17  otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B)

18  of the Bankruptcy Code. Accordingly, it is self-insured and thus a primary plan as defined by the

19  MSP Law.

20  **_Statutory Primary Payer Status_**

21     83.     In December 2003, Congress amended the MSP Law to include tortfeasors and their

22  insurance carriers in the definition of a primary plan, after a number of court decisions found that

23  tortfeasors were not primary plans under the law.

24     84.     Congress made two important changes. First, Congress expressly defined a "self-

25  insured plan" as "[a]n entity that engages in a business, trade, or profession . . . if it carries its own

26  risk (whether by a failure to obtain insurance, or otherwise) in whole or in part." Congress intended

27  the term "self-insured plan" to be defined broadly. This amendment reflected clear Congressional

28  intent to make tortfeasors liable under the MSP Law.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                    19

85.    The second important amendment to the MSP Law in 2003 was the "demonstrated responsibility" provision, which states that a primary plan must reimburse Medicare only if its responsibility to pay has been demonstrated, which can occur through a judgment, *settlement*, or "other means."

### *Regulatory Primary Payer Status*

86.    Pursuant to 42 C.F.R. § 411.21, the definition of primary plan, when used in the context in which Medicare is the secondary payer, includes "liability insurance policy or plan (including a self-insured plan).

87.    Section 411.21 also defines a primary payer as any entity that is or was required or responsible to make payment with respect to an item or service under a primary plan, including, but not limited to, insurers or self-insurers.

88.    Asbestos trusts are established by "primary payers." Specifically, asbestos trusts are funded by tortfeasors which qualify as primary plans pursuant to the 2003 MSP Law amendment.

89.    As asbestos trusts are established for the ***sole purpose*** of paying the past and future claims of tortfeasors, they are themselves primary plans pursuant to federal law and regulations.[7] *See Humana Inc. v. Shrader & Assoc., LLP*, 584 B.R. 658, 678-81 (S.D. Tex. 2018) ("the court concludes that pursuant to the 2003 amendments to the MSP provisions, asbestos trusts can constitute primary plans under the MSP.").

90.    The Trust is one such entity that has been created and funded for the sole purpose of settling the past and future personal injury claims for the Tortfeasors and is therefore a primary plan under federal law and regulations.

/ / /

/ / /

/ / /

---

[7] In fact, recently established asbestos trusts for Maremont Corporation and Kaiser Gypsum Company acknowledged this by including reporting requirement language in their trust agreements: "The Asbestos Trust shall register as a Responsible Reporting Entity ("RRE") under the reporting provisions of Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) ("MMSEA") in order to fulfill the reporting requirements applicable to the funders of the Asbestos Trust."

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                        20

*__The Trust is Obligated to Provide Claimant Information to Plaintiffs__*

91.     A vital aspect of the MSP Law is the effective identification of primary payers. These notice requirements are necessary to achieve the MSP Law's cost cutting goal and to limit the hide and seek game that primary payers, such as the Trust, rely on. *See Blue Shield Ass'n v. Sullivan,* 794 F. Supp. 1166, 1175 (D.C. Cir. 1992) ("[T]he MSP statutory scheme is not a game of hide and seek, in which private parties may sit back and wait until the government independently determines that private coverage exists.").

92.     Pursuant to 42 C.F.R. § 411.25(a), a primary payer is obligated to "provide notice about primary payment responsibility and information about the underlying MSP situation." When primary payers, including Defendants, enter into settlement agreements, they are required to "provide notice about primary payment responsibility and information about the underlying MSP situation to the entity or entities designated by CMS to receive and process that information." *Id*.

93.     Self-insured product liability tortfeasors or their liability insurers that pay settlement funds to Medicare beneficiaries are primary plans subject to MSP reporting and reimbursement obligations. Settlement funds paid by such tortfeasors constitute a source from which MA Plans may obtain recovery.

94.     Where a Medicare claim was filed by, or on behalf of, a claimant of an asbestos trust, federal regulations expressly authorize that trust to release information pertinent to the Medicare claim to Plaintiffs. 42 C.F.R. § 411.24(a); *see also* 42 C.F.R. § 422.108(f) ("[t]he MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter.").

*__As Primary Payers, Federal Statutes Require Asbestos Trusts to Provide Information About Settlements__*.

95.     Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA") requires primary plans to secure from plan participants such information to identify situations where a primary payer is available. *See* 42 U.S.C. § 1395y(b)(8).

/ / /

/ / /

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                        21

96.    Primary plans must determine whether a claimant (including an individual whose claim is unresolved) is entitled to Medicare and, if so entitled, submit the identity of the claimant and other identifying information to enable the Secretary to make an appropriate determination concerning coordination of benefits, including any applicable recovery claim. *See* 42 U.S.C. § 1395y(b)(8).

97.    The Trust's Claim Form requires filers to identify whether the claimant was eligible for Medicare even though the Claimant is under age 65, whether any of the medical expenses of the injured party related to their claims have been paid by Medicare, whether any such Medicare payments are continuing, and whether Medicare's lien for such payments has been satisfied by claimant (such as participation in an approved Global Settlement with Medicare). The Claim Form also requires that if a Medicare lien has been satisfied, that the proof of Medicare lien satisfaction be submitted along with the Claim Form.

98.    While the Trust requests Medicare information from Trust claimants, it fails to report the settlements it pays Medicare Part C beneficiary claimants to CMS or the Assignors and fails reimburse the Assignors for the conditional payments they have made under Medicare Part C, in violation of federal law.

### *Plaintiffs are Entitled to Reimbursement of their Assignors' Conditional Payments*

99.    As MA Plans, Assignors provided benefits under agreements and coverage documents that give them: (a) broad rights of reimbursement from tortfeasors related to conditional payments; (b) rights to prompt notice of settlement or judgment from tortfeasors; and (c) other similar rights that are necessary to protect Plaintiffs' and their Assignors' ability to enforce their rights.

100.    When Defendants disburse settlement funds to an asbestos claimant without accounting for Plaintiffs' and their Assignors' rights, Plaintiffs' and their Assignors' ability to enforce their rights is impaired or extinguished, thus directly harming Plaintiffs, their Assignors, and the Medicare Trust.

/ / /

/ / /

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1

# FIRST CLAIM FOR RELIEF

## DECLARATORY RELIEF

101.    Plaintiffs incorporate by reference paragraphs 1 through 100 as if set forth fully herein.

102.    There is a genuine and bona fide dispute and an actual controversy and disagreement between Plaintiffs and Defendants regarding the Trust's legal status as a primary plan under the MSP Law and whether Defendants have reporting obligations under both the MSP Law and federal regulations.

103.    Pursuant to 28 U.S.C. § 2201, *et seq.*, Plaintiffs are entitled to declaratory relief that:

    a.    The Trust is a primary plan under the MSP Law;

    b.    Defendants are obligated to provide notice of primary payment responsibility and information about the underlying MSP situation (including, but not limited to, for each claimant, name, address, gender, date of birth, health insurance claim (HIC) number, and Social Security number) to Plaintiffs pursuant to 42 C.F.R. § 411.25 (guidelines for compliance with 42 C.F.R. § 411.25 can be found in Medicare Program; Medicare Secondary Payment, 59 Fed. Reg. 4285, 4287 (Jan. 31, 1994)); and

    c.    Defendants must determine whether a claimant (including an individual whose claim is unresolved) is entitled to Medicare benefits, and if so, submit the claimant's information to the HHS Secretary to enable CMS to make an appropriate determination concerning coordination of benefits, pursuant to 42 U.S.C. § 1395y(b)(8).

## SECOND CLAIM FOR RELIEF

## PRIVATE CAUSE OF ACTION UNDER 42 U.S.C. § 1395y(b)(3)(A)

104.    Plaintiffs incorporate by reference paragraphs 1 through 100 as if set forth fully herein.

105.    Plaintiffs assert a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

106.    The elements of a cause of action under 42 U.S.C. § 1395y(b)(3)(A) are: (a) the existence of a primary plan; (b) the primary plan's failure to provide for primary payment or appropriate reimbursement; and (c) damages.

107.    The Trust was established for the sole purpose of settling claims against the Tortfeasors for asbestos-related injuries. As such, the Trust is a primary plan, rendering the Trust a primary payer for settled asbestos-related illness claims.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1

23

108.    Pursuant to federal law and regulations, Defendants have a continuing responsibility to provide notice of settlements with claimants who are Medicare beneficiaries, but failed, and continue to fail, to do so.

109.    Pursuant to federal law and regulations, the Trust is responsible for the timely reimbursement of conditional payments of the Enrollees' asbestos-related illness expenses made by Plaintiffs' Assignors; however, the Trust failed, and continues to fail, to do so.

110.    The Trust was and is required to reimburse said conditional payments even if it has already released settlement funds to other parties, including claimants and/or their counsel. *See* 42 C.F.R. § 411.24(i).

111.    Because the Trust is a primary payer, the Medicare payments for which Plaintiffs seek reimbursement were conditional payments under the MSP Law.

112.    The Trust's obligation to reimburse conditional payments pursuant to the MSP Law is independent of, and in addition to, its reporting obligations under the MMSEA or federal regulations.

113.    Assignors suffered money damages as a direct result of the Trust's failure to reimburse the asbestos-related illness expenses.

114.    Plaintiffs bring this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A) to recover double the amount of the primary payment or appropriate reimbursement that the Trust, as the primary payer, failed to provide plus interest for its failure to timely reimburse conditional payments made by the Assignors for their Enrollees' asbestos-related illness expenses.

115.    Each Assignor made payments and/or provided benefits on behalf of their Enrollees, for items and services required as a result of injuries suffered due to asbestos exposure.

116.    At the time the Assignors made these payments, they did not know that primary coverage provided by the primary payers existed or that any primary plan could be expected to pay promptly for their Enrollees' asbestos-related medical expenses. Accordingly, the Assignors' payments were conditional. *See* 42 C.F.R. § 411.21.

/ / /

/ / /

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1    24

117.    The Tortfeasors have not reimbursed the Assignors out of the settlement payments they have made to their claimants. Further, neither the Trust, nor their claimants, have resolved or satisfied the Assignors' reimbursement claims.

118.    The MSP Law and federal regulations require all participants in the tort recovery system, including asbestos trusts, to honor the reimbursement rights of Medicare and the Assignors.

119.    Approximately 11,000 claims have been submitted to the Trust, with over 5,000 claims having been paid out totaling over $167 million according to the Trust's annual reports. In many, if not most, of these instances, the Trust settled with claimants that received asbestos recoveries; however, Defendants failed to disclose the settlement to, or reimburse, Assignors that paid for, or otherwise provided the treatment of claimants' asbestos-related medical care. By failing to do so, Defendants are cheating the Medicare system in violation of federal law.

120.    The Assignors advanced conditional payments for medical treatment of asbestos-related illnesses for their Enrollees.

121.    The Tortfeasors are self-insured plans that are "primary plans" under the MSP Law and that funded the Trust for the sole purpose of making settlement payments (including trust payouts) to the claimants, that include Enrollees of the Assignors.

122.    These asbestos recoveries constitute payments under a primary plan, entitling Plaintiffs to recover conditional payments made on behalf of each claimant whose asbestos-related illnesses were treated, or whose treatment was paid for, by an Assignor.

123.    CMS regulations provide, *inter alia*, that the Assignors are entitled to exercise the same rights to recover from a primary plan, entity, or individual as those granted to Medicare under 42 C.F.R. Part 411, subparts B–D. CMS has interpreted this to mean that the Assignors have the right (and responsibility) to collect from primary payers using the same procedures that are available to traditional Medicare.

124.    Federal regulations implementing the MSP Law broadly define the entities from which Medicare, Assignors, and therefore, Plaintiffs can recover primary payments. *See* 42 C.F.R. § 411.24(g). Such recovery may be had from any entity, including a beneficiary provider, supplier, physician, attorney, state agency or private insurer that has received a primary payment.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                                    25

125.    The Trust made, and continues to make, such payments to asbestos claimants covered by the Assignors.

126.    Neither the Trust, nor its claimants, have reimbursed Plaintiffs or their Assignors for the conditional payments made on behalf of the Enrollees for the medical care provided as a result of exposure to the Tortfeasors' asbestos products.

127.    The Trust was required to reimburse Plaintiffs for unreimbursed conditional Medicare payments (plus interest).

128.    Congress established a private cause of action under 42 U.S.C. § 1395y(b)(3)(A), permitting the recovery of damages which shall be double the amount that a primary plan failed to timely provide for primary payment (or appropriate reimbursement) of conditional payments.

129.    Since neither Plaintiffs, nor their Assignors, received payment for the billed amount of their Enrollees' medical treatment for asbestos-related illnesses provided by Assignors, Plaintiffs are entitled to recover from the Trust double the amount that the Trust, as the primary payer, failed to provide plus interest.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

1.    A declaratory judgment that:

   a.    The Trust is a "primary plan" as contemplated by 42 U.S.C. § 1395y(b) [section 1862(b) of the Social Security Act], and 42 C.F.R. Part 411.

   b.    Pursuant to 42 C.F.R. § 411.25, on the Trust's behalf, the Co-Trustees are obligated to provide notice of primary payment responsibility and information about the underlying MSP situation (including, but not limited to, for each claimant, name, address, gender, date of birth, health insurance claim (HIC) number, and Social Security number) to Plaintiffs to receive and process that information;

   c.    Any and all additional relief necessary and proper to effectuate a declaratory judgment entered in Plaintiffs' favor pursuant to 28 U.S. Code § 2202, including, but not limited to, monetary damages; and

   d.    Pursuant to 42 U.S.C. § 1395y(b)(8), on the Trust's behalf, the Co-Trustees are obligated to determine whether a claimant is entitled to Medicare benefits; and if the claimant is determined to be so entitled, submit the identity of the claimant and such other information as the Secretary shall specify in order to enable the Secretary to make an appropriate determination concerning

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1

26

1  coordination of benefits, including any applicable recovery claim against the
2  Trust.

3  2.    Judgment awarding Plaintiffs

4      a.  Recovery of double the amount that a primary plan failed to timely provide
5          for primary payment (or appropriate reimbursement) of conditional
           payments. under 42 U.S.C. § 1395y(b)(3)(A);

6      b.  Pre-judgment and post-judgment interest consistent with the MSP Law; and

7      c.  Costs and attorneys' fees in favor of Plaintiffs and against Defendants.

8  3.    Such other and further relief to which Plaintiffs are entitled under 28 U.S.C. §§ 2201,

9       2202, the MSP Law or otherwise, or this Court deems just and proper.

10                          **SHULMAN BASTIAN FRIEDMAN & BUI LLP**

11

12  DATED: July 13, 2021                By:  _____/s/ Gary A. Pemberton_____
                                             Alan J. Friedman
13                                           Gary A. Pemberton
                                             Attorneys for MSP RECOVERY CLAIMS,
14                                           SERIES LLC, a Delaware Series Limited Liability
                                             Company: MSPA CLAIMS 1, LLC, a Florida
15                                           Limited Liability Company; MAO-MSO Recovery
                                             II LLC, a Delaware Series Limited Liability
16                                           Company; and MSP RECOVERY CLAIMS
                                             SERIES 44, LLC, a Delaware Series Limited
17                                           Liability Company

18

19

20

21

22

23

24

25

26

27

28

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                              27

# Appendix

A1.    On 5/3/2016, Preferred Medical Plan, Inc. entered into an assignment with MSP Recovery LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims',[] as also specified in Section 1.1." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On 8/8/2016, MSP Recovery, LLC entered into an assignment with MAO-MSO Recovery II LLC, Series PMPI, irrevocably assigning its right to recover payments as assigned from Preferred Medical Plan, Inc. Said assignment included the following language "[a]ssignor, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and is successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims . . . whether based in contract, tort, statutory right, and any and all rights to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims.'" This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under New York law. Consideration was given between each party in executing these assignments.

A2.    On 5/12/2017, SummaCare, Inc. entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights to pursue and/or recover

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                28

monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims'" The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Ohio law. On 6/12/2017, MSP Recovery, LLC entered into an assignment with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from SummaCare, Inc. Said assignment included the following language "Assignor . . . irrevocably assigns, sells, transfers, conveys, sets over and Delivers to Assignee and its successors and assigns, any and all of Assignors right, title ownership and interest in and to the 'Assigned Claims', 'Claims', [']sic]Assigned Assets' and 'Assigned Documents' . . . whether based in contract, tort, statutory right, and any and all rights to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Delaware law. Consideration was given between each party in executing these assignments.

A3.    On 12/16/2014, Interamerican Medical Center Group, LLC (IMC) entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient appoints, directs, and, otherwise, irrevocably assigns all of Client's rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement…." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On 2/20/2015, MSP Recovery, LLC entered into an assignment with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments as assigned from Interamerican Medical Center Group, LLC (IMC)." Said

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                                        29

assignment included the following language "[a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Florida law.

A4.    Effective April 28, 2016, Health First Health Plans, Inc. ("HFHP"), a Medicare Advantage organization, irrevocably assigned all rights to recover payments made on behalf of its Enrollees to MSP Recovery (the "HFHP Assignment"). The HFHP Assignment expressly provides, in pertinent part:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto . . . all of which shall constitute the "Assigned Claims."
>
> …
>
> The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

HFHP Assignment.[8]

On June 12, 2017, MSP Recovery assigned all rights acquired under the HFHP Assignment to Series 16-05-456, a designated series of MSPRC (the "Series Assignment"). The Series Assignment states:

---

[8] The agreements entered between MSP Recovery, Health First Administrative Plans, and Health First Health Plans have been the subject of much litigation over the last three years; however, the Eleventh Circuit Court of Appeals in *MSP Recovery Claims, Series LLC v. QBE Holdings, Inc.*, 965 F. 3d 1210 (11th Cir. 2020) held that the assignment agreements properly assigned the claims and are the relevant documents providing standing to assert HFHP recovery rights.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1                    30

[T]he undersigned Assignor . . . irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the Claims and Assigned Claims, (and all proceeds and products thereof, including any related assigned assets and assigned documents) as such terms are defined or contained in that certain (1) Assignment and (2) Addendum to the Recovery Agreement and Assignment Addendum, both given and effective April 28, 2016 and executed on June 1, 2018, by and between Health First Health Plans, Inc., a Florida corporation and Medicare Advantage Organization and party to contract number H1099 with The Centers for Medicare & Medicaid Services, as the "Client" and health plan assignor, and [MSP Recovery], a Florida limited liability company (the "Assignment"); irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment from the Client, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

Further, on October 22, 2020, Series 16-05-456 entered into an assignment agreement with to Series 44-20-456, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery. This third assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

[Series 16-05-456] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-456] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to the [claims], as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims" ) as such terms are defined in the Agreements.

This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HFHP, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HFHP arising from or relating to the Claims and all information relating thereto.

Consideration was given between each party in executing these assignments.

SHULMAN BASTIAN
FRIEDMAN & BUI LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

6298-000\56\1603179.1

# EXHIBIT A

J.T. THORPE, INC., A CALIFORNIA CORPORATION /
J.T. THORPE, INC., A DISSOLVED CALIFORNIA CORPORATION
/ THORPE HOLDING COMPANY, INC., A CALIFORNIA
CORPORATION / THORPE TECHNOLOGIES, INC.,
A CALIFORNIA CORPORATION
ASBESTOS PERSONAL INJURY SETTLEMENT
FOURTH AMENDMENT TO AND COMPLETE RESTATEMENT OF
TRUST DISTRIBUTION PROCEDURES

Exhibit A, page 033

J.T. THORPE, INC., A CALIFORNIA CORPORATION / J.T. THORPE, INC.,
A DISSOLVED CALIFORNIA CORPORATION / THORPE HOLDING COMPANY, INC.,
A CALIFORNIA CORPORATION / THORPE TECHNOLOGIES, INC.,
A CALIFORNIA CORPORATION
ASBESTOS PERSONAL INJURY SETTLEMENT
FOURTH AMENDMENT TO AND COMPLETE RESTATEMENT OF
TRUST DISTRIBUTION PROCEDURES

### TABLE OF CONTENTS

**SECTION I**
**Introduction** ...........................................................................................................................5
    **1.1**    **Purpose.** ............................................................................................................5
    **1.2**    **Interpretation.** .................................................................................................5

**SECTION II**
**Overview** .................................................................................................................................5
    **2.1**    **Trust Goals.** .....................................................................................................5
    **2.2**    **Trust Claim Liquidation Procedures.** ...........................................................6
    **2.3**    **Trust Application of the Payment Percentage.** ............................................7
    **2.4**    **Trust's Determination of the Maximum Annual Payment.** .........................8
    **2.5**    **Trust Claims Payment Ratio.** ........................................................................8
    **2.6**    **Trust Indemnity and Contribution Claims.** ................................................10

**SECTION III**
**TDP Administration** ............................................................................................................10
    **3.1**    **Trust Advisory Committee and Futures Representative.** ..........................10
    **3.2**    **Consent and Consultation Procedures.** ......................................................11

**SECTION IV**
**Payment Percentage; Periodic Estimates** .........................................................................11
    **4.1**    **Uncertainty of Thorpe's Personal Injury Asbestos Liabilities** ...............11
    **4.2**    **Computation of Payment Percentage.** ........................................................11
    **4.3**    **Applicability of the Payment Percentage.** .................................................12

**SECTION V**
**Resolution of Trust Claims** ................................................................................................13
    **5.1**    **Threshold Requirement for Submitting a Claim to the Trust.** .................13
    **5.2**    **Statute of Limitations or Repose for Trust Claims.** ..................................14
    **5.3**    **Ordering, Processing and Payment of Claims.** .........................................14
    **5.4**    **Resolution of Pre-Confirmation Trust Claims.** ........................................16
    **5.5**    **Hardship Claims.** ..........................................................................................17
    **5.6**    **Contribution Claims.** ....................................................................................18
    **5.7**    **Claim Auditing and Review Procedures.** ...................................................19
    **5.8**    **Second Disease Claims.** ................................................................................20
    **5.9**    **Arbitration.** ...................................................................................................20
    **5.10**    **Litigation After Electing Non-Binding Arbitration.** ................................21
    **5.11**    **Claims Eligible for Tort System Valuation Without Having First Pursued
             Non-Binding Arbitration.** ..........................................................................21

Exhibit A, page 034

**SECTION VI**

**Claims Materials** .............................................................................................................**22**
    6.1    **Claims Materials.** ......................................................................................**22**
    6.2    **Content of Claims Materials.** ....................................................................**23**
    6.3    **Withdrawal of Claims.** ..............................................................................**26**
    6.4    **Inactive Claim Status.** .............................................................................**27**
    6.5    **Filing Fees.** .............................................................................................**27**
    6.6    **Assignment of Direct Actions to the Trust.** ..............................................**27**

**SECTION VII**

**General Guidelines for Liquidating and Paying Claims** ....................................................**27**
    7.1    **Discretion to Vary the Order and Amounts of Payments in Event of Limited**
            **Liquidity.** ................................................................................................**27**
    7.2    **Punitive Damages.** ...................................................................................**28**
    7.3    **Suits in the Tort System.** ..........................................................................**28**
    7.4    **Payment of Judgments for Money Damages.** .............................................**29**
    7.5    **Releases.** .................................................................................................**30**
    7.6    **Third-Party Services.** ...............................................................................**30**
    7.7    **Trust Disclosure of Information.** ..............................................................**30**

**SECTION VIII**

**Miscellaneous** .................................................................................................................**31**
    8.1    **Amendments.** ..........................................................................................**31**
    8.2    **Severability.** ............................................................................................**31**
    8.3    **Governing Law.** ......................................................................................**31**
    8.4    **Attorneys' Fees.** ......................................................................................**31**
    8.5    **Exception in California.** ...........................................................................**32**

Exhibit A, page 035

J.T. THORPE, INC., A CALIFORNIA CORPORATION/J.T. THORPE, INC.,
A DISSOLVED CALIFORNIA CORPORATION/THORPE HOLDING COMPANY, INC.,
A CALIFORNIA CORPORATION/THORPE TECHNOLOGIES, INC.,
A CALIFORNIA CORPORATION
ASBESTOS PERSONAL INJURY SETTLEMENT
FOURTH AMENDMENT TO AND COMPLETE RESTATEMENT OF
TRUST DISTRIBUTION PROCEDURES

The J.T. Thorpe, Inc., a California corporation/J.T. Thorpe, Inc., a dissolved California

corporation/Thorpe Holding Company, Inc., a California corporation/Thorpe Technologies, Inc.,

a California corporation Asbestos Personal Injury Settlement Trust Distribution Procedures

("TDP") contained herein provide for satisfying all asbestos-related personal injury and death

claims caused by conduct of, and/or exposure to asbestos-containing products for which,

J.T. Thorpe, Inc., a California corporation; J.T. Thorpe, Inc., a dissolved California corporation;

Thorpe Holding Company, Inc., a California corporation; or Thorpe Technologies, Inc., a

California corporation (collectively "Thorpe"), their predecessors, successors, and assigns have

legal responsibility (hereinafter for all purposes of this TDP defined as "Trust Claims"), as

provided in and required by the "First Amended Joint Plan of Reorganization, Dated August 5,

2005" (as such plan may hereinafter be further amended, revised, and/or supplemented, the

"Plan") and the J.T. Thorpe Personal Injury Settlement Trust Agreement ("Trust Agreement").

The Plan and Trust Agreement establish the J.T. Thorpe Personal Injury Settlement Trust

("Trust").  The Trustees of the Trust ("Trustees") shall implement and administer this TDP in

accordance with the Trust Agreement.  Capitalized terms used herein and not otherwise defined

shall have the meanings assigned to them in the Glossary, attached as Exhibit 1 to the Plan.

Exhibit A, page 036

## SECTION I

### Introduction

**1.1     Purpose.**  This TDP has been adopted pursuant to the Trust Agreement.  It is designed to provide fair and equitable treatment for all Trust Claims that may presently exist or may arise in the future in substantially the same manner.

**1.2     Interpretation.**  Nothing in this TDP shall be deemed to create a substantive right for any claimant.

## SECTION II

### Overview

**2.1     Trust Goals.**  The goal of the Trust is to treat all claimants equitably.  This TDP furthers that goal by setting forth procedures for processing and paying claims generally on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.  To this end, the TDP establishes for unliquidated claims in the Case Valuation Matrix ("Matrix"), attached hereto as Appendix I, a schedule of five asbestos-related diseases ("Compensable Diseases"), which have presumptive medical and exposure requirements ("Medical/Exposure Criteria"), criteria for establishing liquidated values ("Matrix Values"), anticipated average values ("Average Values"), and caps on liquidated values ("Maximum Values").  The Compensable Diseases, Medical/Exposure Criteria, Matrix Values, Average Values and Maximum Values, which are set forth in the Matrix, have all been selected and derived with the intention of achieving a fair allocation of the Trust funds as among claimants suffering from different disease processes in light of the best available information, considering the settlement history of Thorpe and the rights claimants would have in the tort

Exhibit A, page 037

system absent the bankruptcy. The TDP also provides mechanisms for the treatment and payment of Liquidated Claims.

**2.2    Trust Claim Liquidation Procedures.** Trust Claims shall be processed based on a first-in-first-out "FIFO" basis called the FIFO Processing Queue to be established pursuant to Section 5.3 below. The Trust shall liquidate all Trust Claims that meet the presumptive Medical/Exposure Criteria in accordance with the Matrix. Claims that do not meet the presumptive Medical/Exposure Criteria for the relevant Compensable Disease may undergo the Trust's Individual Review Process described in the Matrix. In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Compensable Disease, the Trust can offer the claimant an amount equal to a standard qualified claim of that Compensable Disease if the Trust is satisfied that the claimant has presented a claim that would be cognizable, valid and compensable in the tort system.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to binding or non-binding arbitration, at the election of the claimant, under the Arbitration Rules. Disputes with the Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.9 and 7.3 below. However, if and when a claimant obtains a judgment in the tort system, the judgment will be payable (subject to the Payment Percentage, Maximum Annual Payment, and Disease Category Claims Payment Ratio provisions set forth below) as provided in Section 7.4 below.

Exhibit A, page 038

**2.3**    **Trust Application of the Payment Percentage.**  After the liquidated value of a Trust Claim is determined, the claimant will ultimately receive a *pro-rata* share of that value based on a Payment Percentage calculated as described in Section 4.2 below.  The Initial Payment Percentage shall be 50% in accordance with the "Agreement Regarding Initial Payment Percentage" between the Committee and the Futures Representative dated June 29, 2006.

The Payment Percentage may be adjusted upwards or downwards from time to time by the Trust with the consent of the Trust Advisory Committee "TAC" (as defined in Section 3.1 below) and the Futures Representative (as defined in Section 3.1 below) to reflect then-current estimates of the Trust's assets and its liabilities, as well as the estimated value of then-pending and future claims. However, any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below.  If the Payment Percentage is increased over time, claimants who have previously been paid by the Trust will receive a proportional additional payment unless the Trust with consent of the TAC and the Futures Representative concludes that the amount is so modest and the administrative costs and burdens are so great in comparison to the benefits to claimants that such additional payments shall be omitted or deferred.

To the extent that the designated legal representative of a claimant or heir (or the Trust in the case of in pro per claimants), following reasonable efforts, cannot locate a claimant or heir within one year from the approval of any additional payment pursuant to Section 4.2, the legal representatives shall return all funds, which must be held in client trust accounts, to the Trust which the Trust shall return to net claimant equity.  To the extent the Trust cannot locate a claimant or heir in pro per within one year from the approval of any additional payment pursuant to Section 4.2 following reasonable efforts, the entire additional payment shall also be returned to net claimant equity.

Exhibit A, page 039

**2.4      Trust's Determination of the Maximum Annual Payment.**  The Trust shall

estimate or model the amount of cash flow anticipated to be necessary over its entire life to

ensure that funds will be available to treat all present and future claimants as similarly as

possible. In each year, the Trust will be empowered to pay out all of the interest earned during

the year, together with a portion of its principal, calculated so that the application of Trust funds

over its life shall correspond with the needs created by the anticipated flow of claims (the

"Maximum Annual Payment").  The Trust's distributions to claimants for that year shall not

exceed the Maximum Annual Payment determined for that year.

**2.5      Trust Claims Payment Ratio.** Based upon Thorpe's claim settlement history and

analysis of present and future claims, a Disease Category Claims Payment Ratio has been created

based upon the category of disease claimed ("Disease Categories").

For claims paid during the year 2005, the Disease Category Claims Payment Ratio shall

be 90% (the "Category A Percentage") for "Category A" claims, which consist of Trust Claims

involving malignant claims that were unliquidated as of the Effective Date, and 10% for

"Category B" claims (the "Category B Percentage"), which are Trust Claims involving

non-malignant claims that were similarly unliquidated as of the Effective Date.  For claims paid

during the years 2006 through and including 2007, the Category A Percentage shall be 89% and

the Category B Percentage shall be 11%.  For claims paid during the years 2008 through and

including 2025, the Category A Percentage shall be 90% and the Category B Percentage shall be

10%.  For claims paid during the years 2026 through and including 2039, the Category A

Percentage shall be 91% and the Category B Percentage shall be 9%.   In each year, after the

determination of the Maximum Annual Payment, the Category A Percentage of that amount will

Exhibit A, page 040

be available to pay liquidated Category A claims and the Category B Percentage will be available to pay liquidated Category B claims that have been liquidated since the Effective Date.

In the event there are insufficient funds in any year to pay the liquidated claims against Thorpe within the Disease Categories, the available funds within the particular Disease Category shall be paid to the maximum extent to claimants in the particular Disease Category based on their place in the FIFO Payment Queue described in Section 5.3(c) below based upon the date of claim liquidation.  Claims for which there are insufficient funds will be carried to the next year where they will be placed at the head of the FIFO Payment Queue.  If there are excess funds in either or both Disease Category, because there was an insufficient amount of liquidated claims to exhaust the respective Maximum Annual Payment amount for that Disease Category, then the excess funds for either or both Disease Categories will be rolled over and remain dedicated to the respective Disease Category to which they were originally allocated.

The Disease Category Claims Payment Ratio shall be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice.  The accumulation, rollover and subsequent delay of claims resulting from the application of the Disease Category Claims Payment Ratio, shall not, in and of itself, constitute such circumstances.  Nor may an increase in the numbers of Disease Category B claims beyond those predicted or expected be considered as a factor in deciding whether to reduce the percentage allocated to Disease Category A.  In considering whether to make any amendments to the Disease Category Claims Payment Ratio, the Trustees should also consider the reasons for which the Disease Category Claims Payment Ratio was adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment.  In that regard, the Trustees should keep in mind the

interplay between the Payment Percentage and the Disease Category Claims Payment Ratio as it affects the net cash actually paid to claimants. In any event, no amendment to the Disease Category Claims Payment Ratio may be made without the consent of the TAC and the Futures Representative pursuant to the consent process set forth in Section 2.2(f) of the Trust Agreement. However, the Trustees may offer the option of a reduced payment percentage to either Disease Category in return for prompter payment (the "Reduced Payment Option"), after first obtaining the consent of the TAC and Futures Representative.

    **2.6**    **Trust Indemnity and Contribution Claims.** As set forth in Section 5.6 below, Trust Claims for indemnity and contribution (if any) will be subject to the same categorization, evaluation, and payment provisions of this TDP as all other Trust Claims.

## SECTION III

### TDP Administration

    **3.1**    **Trust Advisory Committee and Futures Representative.** Pursuant to the Plan and the Trust Agreement, this TDP will be administered by the Trustees in consultation with a three-member Trust Advisory Committee ("TAC"), that represents the interests of holders of present Trust Claims, and a Legal Representative for Future Asbestos-Related Claimants ("Futures Representative"), who represents the interests of holders of Trust Claims that will be asserted in the future. The Trustees shall obtain the consent of the TAC and the Futures Representative to any amendments to these Procedures pursuant to Section 8.1 below, and to such other matters as are otherwise required below and in Section 2.2(f) of the Trust Agreement. The Trustees shall also consult with the TAC and the Futures Representative on such matters as are provided below and in Section 2.2(e) of the Trust Agreement. The initial members of the TAC and the initial Futures Representative are identified in the Trust Agreement.

Exhibit A, page 042

**3.2** **Consent and Consultation Procedures.** In those circumstances in which consultation or consent is required, the Trustees will provide written notice to the TAC and the Futures Representative of the specific amendment or other action that is proposed. The Trustees will not implement such amendment nor take such action unless and until the parties have engaged in the consultation process described in Section 2.2(e), or the Consent Process described in Sections 5.6 and 6.6 and if necessary, 5.7 and 6.7 of the Trust Agreement.

## SECTION IV

### Payment Percentage; Periodic Estimates

**4.1** **Uncertainty of Thorpe's Personal Injury Asbestos Liabilities** As discussed above, there is inherent uncertainty regarding Thorpe's total asbestos-related tort liabilities, as well as the total value of the assets available to pay such claims. Consequently, there is inherent uncertainty regarding the amounts that holders of Trust Claims will receive. To seek to ensure substantially equivalent treatment of all present and future claims, the Trustees must determine from time to time the percentage of full liquidated value that holders of Trust Claims will be likely to receive, i.e, the "Payment Percentage" described in Section 2.3 above and Section 4.2 below.

**4.2** **Computation of Payment Percentage.** The Initial Payment Percentage shall be the percentage set forth in Section 2.3 of this TDP. The Payment Percentage shall be subject to change pursuant to the terms of this TDP and the Trust Agreement if the Trustees determine, with consent of the TAC and the Futures Representative, that an adjustment is required. Commencing on the first day of January, after the Plan has been Confirmed, the Trustees shall reconsider the then applicable Payment Percentage to assure that it is based on accurate current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the Futures Representative. Thereafter, no less frequently than

Exhibit A, page 043

once every three years, commencing with the first day of January occurring after the Plan is

consummated, the Trustees shall reconsider the then applicable Payment Percentage to assure

that it is based on accurate, current information and may, after such reconsideration, change the

Payment Percentage if necessary with the consent of the TAC and the Futures Representative.

The Trustees shall also reconsider the then applicable Payment Percentage at shorter intervals if

he or she deems such reconsideration to be appropriate or if requested to do so by the TAC or the

Futures Representative.  The Trustees must base his or her determination of the Payment

Percentage on current estimates of the number, types, and values of present and future Trust

Claims, the value and liquidity of the assets then available to the Trust for their payment, all

anticipated administrative and legal expenses, and any other material matters that are reasonably

likely to affect the sufficiency of funds to pay a comparable percentage of full value to all

holders of Trust Claims.  When making these determinations, the Trustees shall exercise

common sense and flexibly evaluate all relevant factors. The Payment Percentage applicable to

one category of claims may not be reduced to alleviate delays in another category claims

payments caused by a backlog in that category.  All claims will receive the same Payment

Percentage.

    **4.3**   **Applicability of the Payment Percentage.**  No holder of a Trust Claim shall

receive a payment that exceeds the Trust's determination of the Initial Payment Percentage, or

the Payment Percentage in effect at the time of payment in the case of all other Trust Claims

unless a Reduced Payment Option applies.  If a redetermination of the Payment Percentage has

been proposed in writing by the Trustees to the TAC and the Futures Representative but has not

yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the

proposed Payment Percentage.  However, if the proposed Payment Percentage was the lower

amount but is not subsequently adopted, the claimant shall thereafter receive the difference

between the lower proposed amount and the higher current amount.  Conversely, if the proposed

Payment Percentage was the higher amount and is subsequently adopted, the claimant shall

thereafter receive the difference between the lower current amount and the higher adopted

amount.

## SECTION V

### Resolution of Trust Claims

**5.1    Threshold Requirement for Submitting a Claim to the Trust.** If a Claimant or

Injured Person has commenced litigation seeking compensation for asbestos-related injuries or

death that are the subject of a claim in a court where one or more of the Debtors liable for such

claim was subject to in personam jurisdiction as of February 12, 2002, then that jurisdiction shall

determine which limitations period, category, Average Value, and base case shall be used subject

to the exceptions stated herein.  If multiple pre-petition lawsuits in different jurisdictions naming

one or more of the Debtors liable for such claim have been filed for an Injured Person or

Claimant, then such Injured Person or Claimant may choose the prepetition jurisdiction (from

among the different jurisdictions in which the pre-petition lawsuits naming one or more of the

Debtors liable for such claim were filed for that Injured Party or Claimant, so long as in

personam jurisdiction existed) in which the limitations period, category, Average Value, and

base case shall be used.  If a Claimant does not have a pending lawsuit against one or more of the

Debtors at the time of the submission to the Trust, then in lieu of having a tort action filed for

purposes of this TDP, the Claimant or Injured Person must submit a verified certification under

penalty of perjury, either of counsel based upon counsel's records, or of Claimant or Injured

Person stating facts which establish in personam jurisdiction in a court where one or more of the

Debtors liable for such claim was subject to in personam jurisdiction as of February 12, 2002 or

Exhibit A, page 045

incorporate a lawsuit which asserts those facts, and therefore such person can meet the

jurisdictional requirements of the particular state in which the tort claim would have been timely

and properly filed.  The Trust shall have the right to contest any such certification. The

jurisdiction so certified shall determine which limitations period, category, Average Value, and

base case shall be used subject to the exceptions stated herein.

    **5.2**    **Statute of Limitations or Repose for Trust Claims.** The statute of limitations

and the choice of law determination applicable to claims against the Trust shall be determined by

reference to the tort system where a claim against a Debtor was pending on the filing date of

these cases, or where such a claim could have been timely and properly filed as asserted by the

Claimant or Injured Person.

    **5.3**    **Ordering, Processing and Payment of Claims.**

    **5.3(a)  Ordering of Claims.**

    **5.3(a)(1)  Establishment of the FIFO Processing Queue.** The Trust will

order unliquidated claims for processing purposes on a FIFO basis except as otherwise provided

herein (the "FIFO Processing Queue"). For all claims filed on or before the date six months after

the Effective Date (the "Initial Claims Filing Date"), a claimant's position in the FIFO

Processing Queue shall be determined as of the earlier of (i) the date prior to February 12, 2002,

"Petition Date" that the specific claim was either served or filed against Thorpe in a court in

which Thorpe could properly have been sued or was actually submitted to Thorpe pursuant to an

administrative processing agreement; (ii) the date before the Petition Date that a claim was filed

or served against another defendant in the tort system if at the time the claim was subject to a

tolling agreement with Thorpe; (iii) the date after the Petition Date but before the Effective Date

that the claim was filed or served against another defendant in a court in which Thorpe could

properly have been sued; or (iv) the date after the Effective Date but on or before the Initial

Exhibit A, page 046

Claims Filing Date that the claim was served or filed with the Trust. Following the Initial

Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by

the date the claim was filed with the Trust. For all claims filed on the same date, the claimant's

position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the

asbestos-related disease.

      **5.3(a)(2)  Effect of Statutes of Limitations and Repose.** All claims

barred by the applicable statute of limitations or repose, as determined in Section 5.2 above, at

the Petition Date shall remain barred on and after the Petition Date. All claims not so barred

shall be tolled as of the Petition Date to and including October 16, 2007, without the need of the

claimant to take any action whatsoever, including without limitation, filing a Proof of Claim in

the Reorganization Cases.

      **5.3(b)  Processing of Unliquidated Trust Claims.** Within six months after the

establishment of the Trust, the Trustees with the consent of the TAC and the Futures

Representative shall adopt procedures for reviewing and liquidating all unliquidated Trust

Claims, which shall include deadlines for processing such claims. Such procedures shall also

require claimants seeking resolution of unliquidated Trust Claims to first file a Trust Claim form,

together with the required supporting documentation, in accordance with the provisions of

Sections 6.1 and 6.2 below. It is anticipated that the Trust shall provide an initial response to the

claimant within six months of receiving the Trust Claim form. All claims filed with the Trust

shall be deemed to be a claim for the highest Compensable Disease for which the claim qualifies

at the time of filing, with all lower Compensable Diseases for which the claim then qualifies or

may qualify in the future subsumed into the higher Compensable Disease for both processing and

payment purposes. Upon filing of a valid Trust Claim form with the required supporting

-15-

documentation, the claim shall be placed in the FIFO Processing Queue in accordance with the
ordering criteria described in Section 5.3(a) above.

The five Compensable Diseases covered by this TDP are set forth in detail in the Matrix.
The Compensable Diseases, Matrix Values, and Medical/ Exposure Criteria shall apply to all
unliquidated claims filed with the Trust.

As a general practice, the Trust will review its claims files on a regular basis and notify
all claimants whose claims are likely to come up in the FIFO Processing Queue in the near
future.

**5.3(c)  Payment of Claims.** Trust Claims shall be paid in FIFO order based on
the date their liquidation became final (the "FIFO Payment Queue"), all such payments being
subject to the applicable Payment Percentage, Maximum Annual Payment, and Disease Category
Claims Payment Ratio, except as otherwise provided herein.  For all claims liquidated on the
same date, each claimant's position in the FIFO Payment Queue shall be determined by the date
of the diagnosis of the claimant's asbestos-related disease.

**5.4    Resolution of Pre-Confirmation Trust Claims.** As soon as practicable after the
Effective Date, the Trust shall pay all Trust Claims that were liquidated by (i) a written
settlement agreement entered into prior to the Petition Date for the particular claim, or (ii) the
pre-confirmation claims liquidation process (collectively, the "Pre-Confirmation Liquidated
Claims").  Notwithstanding the foregoing, these payments shall be subject to the limitations set
forth below in this section.  The liquidated value of a Pre-Confirmation Liquidated Claim shall
be the amount agreed to in the binding settlement agreement, without interest, or the amount at
which the claim is liquidated pursuant to the pre-conformation claims liquidation process, as
applicable.  Moreover, to the extent that a claim is the subject of a written settlement agreement

Exhibit A, page 048

executed prior to the Petition Date, the holder of that claim shall have the option of (i) having the liquidated value be the amount agreed to in the binding settlement agreement, without interest, or (ii) having his or her claim re-liquidated pursuant to the pre-confirmation claims liquidation process and having the liquidated value be the amount at which the claim is liquidated pursuant to the pre-conformation claims liquidation process. Notwithstanding anything to the contrary set forth in this Section 5.4, pursuant to Section 7.2 below, the liquidated value of a Pre-Confirmation Liquidated Claim shall not include any punitive or exemplary damages.

Pre-Confirmation Liquidated Claims shall be processed and paid within 90 days of the Effective Date, if feasible, or as soon thereafter as is possible. The amounts payable with respect to such claims shall not be subject to or taken into account in consideration of the Maximum Annual Payment or Disease Category Claims Payment Ratio, but shall be subject to the Payment Percentage provisions set forth in Section 4.2 above.

**5.5    Hardship Claims.** At any time the Trust may liquidate and pay certain Trust Claims that qualify as Hardship Claims. Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP. A Hardship Claim, following its liquidation, shall be placed at the head of the FIFO Liquidation Queue for purposes of payment, subject to the Maximum Annual Payment and Disease Category Claims Payment Ratio described above. A Trust Claim qualifies for payment as a Hardship Claim if the Trust, in its sole discretion, determines (a) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (b) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

**5.6**    **Contribution Claims.** Contribution Claims that are asserted against the Trust based upon theories of contribution or indemnification under applicable law may not be processed or paid by the Trust unless (a) such claim would not be disallowed by Section 502(e) of the Code if the Trust were a debtor in a case under the Code, and (b) the holder of such claim (the "Indirect Claimant") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligations of the Trust to the direct claimant to whom the Trust would otherwise have had a liability or obligation under these Procedures, (ii) the direct claimant and the Indirect Claimant have forever released the Trust from all liability to the direct claimant, and (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law.  In no event shall any Indirect Claimant have any rights against the Trust superior to the rights of the related direct claimant against the Trust, including any rights with respect to the timing, amount or manner of payment.

The Trust shall not pay any Indirect Claimant unless and until the Indirect Claimant's aggregate liability for the direct claimant's claim has been fixed, liquidated and paid by the Indirect Claimant pursuant to final judgment and not by settlement.

The credit or offset to which a co-defendant is entitled in the tort system for settlement with the Trust is the amount of the Trust's Payment to the Claimant, which Payment amount shall be determined as:  (a) the actual amount received to date by the Claimant; or (b) if no funds have yet been received, the amount of the liquidated value agreed to by the Claimant and the Trust, multiplied by the *pro rata* share in effect at the time the set-off is being applied.

Contribution Claims shall be processed in accordance with procedures to be developed and implemented by the Trustees, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) only then shall otherwise provide the same liquidation

Exhibit A, page 050

and payment procedures and rights to the holders of such claims as the Trust would have

afforded the holders of the underlying valid Trust Claims.

**5.7**    **Claim Auditing and Review Procedures.**

**5.7(a)  Claims Audit Program.** The Trust with consent of the TAC and Futures

Representative may develop methods for auditing the reliability of evidence reasonably related to

the value of the claim, including additional reading of x-rays and verification of pulmonary

function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to

asbestos-containing products manufactured or distributed by Thorpe, and requesting from

claimants or other Trusts, claims materials submitted to other Trusts.   In the event that the Trust

reasonably determines that any unreliable individual or entity has engaged in a pattern or practice

of providing unreliable medical or other evidence to the Trust, it may decline to accept additional

evidence from such provider in the future.  Further, in the event that an audit reveals that

fraudulent information has been provided to the Trust, the Trust may penalize any responsible

claimant or claimant's attorney by disallowing the related Trust Claim or by other means

including, but not limited to, requiring the claimant or attorney submitting the fraudulent

information to pay the costs associated with the audit and any future related audit or audits,

reordering the priority of payment of all affected claimants' Trust Claims, raising the level of

scrutiny of additional information submitted from the medical facility or other source, refusing to

accept additional evidence from the same, seeking the prosecution of the claimant or claimant's

attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking Rule 11

sanctions.

**5.7(b)  Review by the Trust for the benefit of the TAC and Futures**

**Representative.** The Trust shall cause a review of the filed claims, paid claims, average

payments and disallowed claims by Compensable Disease to be performed bi-annually or upon the request of the TAC or the Futures Representative, sufficient to allow an estimation of the adequacy of the Trust fund to compensate Claimants as compared to the current claims forecast.

**5.8    Second Disease Claims.** The holder of a claim involving a non-malignant asbestos-related disease may file a new claim for a malignant disease that is subsequently diagnosed ("Second Disease Claim"). Any payments to which such claimant may be entitled for such asbestos-related malignancy shall be reduced by the amount paid by the Trust for the non-malignant asbestos-related disease.

**5.9    Arbitration.**

**5.9(a) Establishment of Arbitration Procedures.** The Trust, with the consent of the TAC and the Futures Representative, shall institute Arbitration Rules for resolving disputes concerning the Trust's outright rejection or denial of a claim, or concerning the claimant's medical condition or exposure history for purposes of categorizing a claim.  Binding, non-binding arbitration and tort system valuation shall also be available for resolving disputes over the liquidated value of a claim.  In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in the Matrix.  In the case of an arbitration involving the liquidated value of a claim, the arbitrator shall consider the same valuation factors that are set forth in the Matrix.  With respect to all claims eligible for arbitration, the claimant, but not the Trust, may elect either non-binding or binding arbitration.  If the claimant elects non-binding arbitration, claimant will be responsible for ½ of arbitrator's fees and costs.  The Arbitration Rules may be modified by the Trust with the consent of the TAC and the Futures Representative. Such amendments may also include adoption of mediation

procedures as well as establishment of an Extraordinary Claims Panel to review such claims pursuant to the Matrix.

**5.9(b)    Claims Eligible for Arbitration.** A claim is eligible for arbitration, if it has been rejected by the Trust, or the Trust has made an offer which was rejected by the claimant. The claimant must notify the Trust of such rejection in writing.

**5.9(c)    Limitations on and Payment of Arbitration Awards.** The arbitrator shall not return an award in excess of the appropriate Matrix Value for such claim based upon the facts as found by the arbitrator. For an Extraordinary Claim, the arbitrator shall not return an award greater than the Maximum Extraordinary Value for such a claim as set forth in the Matrix. A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the Trust's original valuation of the claim.

**5.10    Litigation After Electing Non-Binding Arbitration.** A claimant who elects non-binding arbitration and then rejects the arbitral award retains the right to exit to the tort system pursuant to Sections 7.3 below. However, such a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Trust's available cash only as provided in Section 7.4 below.

**5.11    Claims Eligible for Tort System Valuation Without Having First Pursued Non-Binding Arbitration.** A claim is eligible for tort system valuation pursuant to Section 7.3 below, without having first pursued non-binding arbitration, if the Trust has made an offer and the claimant in writing has:

(a) rejected the Trust offer;

(b) counter offered to accept a partial payment of 50% of the Trust's offer;

(c)  agreed both:  (1) not to execute against the Trust on any judgment obtained through the tort system, and (2) not to seek any additional payments from the Trust, including without limitation not to seek any additional payments under Section 7.4 of this TDP;

(d) agreed that the provisions of Sections 3.2(d) and 9.4 of the Plan shall govern any Direct Action including any judgment obtained by Claimant;

(e) agreed that if any Direct Action is successful to the extent the net recovery to the Trust exceeds the Trust's initial offer, claimant shall be entitled to the remaining 50% of the Trust's offer plus a percentage payment of the net recovery in an amount reasonable and appropriate agreed upon by the Trustees, the Trust Advisory Committee and the Futures Representative after taking into account the result obtained and the contribution to that result by claimant which amount shall be payable upon the Trust's actual receipt of funds from the Direct Action recovery. In the event the Trustees, the Trust Advisory Committee and the Futures Representative cannot reach agreement on a reasonable and appropriate percentage payment, the claimant, the Trustees, the Trust Advisory Committee and/or the Futures Representative may request resolution of the dispute by the Bankruptcy Court; and

(f) the Trust has accepted the claimant's counter offer.

## SECTION VI

### Claims Materials

**6.1    Claims Materials.** The Trust shall prepare suitable and efficient claims materials ("Claims Materials"), and shall provide such Claims Materials upon written request.  The Trust Claim form to be submitted to the Trust shall include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. A copy of the Trust Claim forms to be used by the Trust for Pre-Confirmation Liquidated Claims and unliquidated Claims will be created with the consent of the TAC and the

Exhibit A, page 054

Futures Representative within three months of the establishment of the Trust.  The Trust Claim

forms may be changed by the Trust with the consent of the TAC and the Futures Representative.

The Trust shall also establish procedures for electronic filing of claims.

     **6.2**    **Content of Claims Materials.**  The Claims Materials shall include a copy of

this TDP, such instructions as the Trustees shall approve, and Trust Claim forms.  The Trust

Claim forms shall be submitted with supporting documentation in accordance with the

relevant criteria as set forth below and in compliance with Section I of the Matrix.  At a

minimum, the unliquidated Trust Claim form shall require submission of sufficient information

to prove, and any relevant information tending to disprove exposure, disease and damages

including:

     **(a)**    All relevant information called for in the San Francisco Superior Court

General Order 129 Form Interrogatories, Set 1 and Set 2 including the required complete

occupational history and identification of other exposures, with the information relevant to

exposure used to qualify this claim for the particular category highlighted and the pages tabbed.

     **(b)**    If the claimant was involved in any type of asbestos litigation, a complete

copy of any litigation interrogatory responses created in support of that claim must be submitted

to the Trust regardless of the jurisdiction in which the lawsuit was filed with any information

exposures asserted in this claim highlighted and the pages tabbed (or, if applicable, noting that

the interrogatories contain no reference to exposures asserted in this claim).  In addition, the

claimant who was involved in any type of asbestos litigation must identify all prior depositions

of the claimant and produce them upon request.

     **(c)**    If the Claimant is utilizing the Trust Approved Interrogatories (set forth on

the Trust Web site), portions of litigation interrogatories that were amended after the litigation

was concluded or declarations to establish the Trust Claim, the responses and/or declarations must meet the following requirements:

   **(i)**  The interrogatories and/or declarations must be verified or made by a person who is competent to testify to the information stated in the interrogatories and/or declarations and the person must have personal direct knowledge of the factual information relevant to the claim and the answers and/or declarations must provide sufficient background information to explain how the person verifying the interrogatories and/or the declarant(s) acquired the personal direct knowledge of factual matters relevant to this claim, to allow the Trust to determine the credibility of the person verifying the interrogatories and/or the declarants;

   **(ii)**  Where the person lacks personal direct knowledge, the answers and/or declarations must provide sufficient information to explain how, when and from what sources the person verifying the interrogatories and/or the declarants acquired any indirect knowledge of factual matters relevant to the claim;

   **(iii)**  The interrogatory responses and/or declarant must provide specifics about the claimant's (or claimant's decedent's) exposure and not use boilerplate wording;

   **(iv)**  If the person verifying the interrogatories and/or declarants relied upon documents as the basis for the responses given in the interrogatories and/or declarations (i.e. military records, social security records, etc.), those documents must be specifically identified and relevant portions of any such documents included in the supporting documents attached to the claim;

(v)     The truth of the facts asserted in the interrogatories must be affirmed or verified under the penalty of perjury and any declarations must be made under penalty of perjury;

(vi)     All declarations must be specific to the claim.  In appropriate circumstances, the Trust may accept expert opinions pertaining to issues that are of general application and that are relevant to the specific claimant's claim.

(vii)     The Trust shall have the right to interview by phone or in person (always with the participation or presence of claimant's counsel), anyone who verifies interrogatories, or has provided information to the person verifying the interrogatories or who submits a declaration in support of a claim submitted to the Trust.

(d)     Medical records, medical reports and/or death certificates evidencing the claimed disease, with the diagnosis highlighted and the pages tabbed.  For lung cancer and other cancer cases, evidence of markers or other factors which would lead to an upward adjustment under the Matrix will be highlighted and the pages tabbed.  For Grade I claims, evidence of x-ray and PFT values that would lead to an increased award will be highlighted and the pages tabbed.

(e)     For Serious Asbestosis claims, evidence to support this categorization will be highlighted and the pages tabbed.

(f)     For an Injured Person seeking a multiplier for an economic loss in excess of the base case amount, an economic report of evidence supporting claimed wage/pension/home services loss, with total claimed loss highlighted and the page tabbed.

**(g)**     For an Injured Person seeking a multiplier for medical expenses in excess of the base case amount, an affidavit summarizing medical expenses, or submission of medical bills to substantiate the total claimed amount.

**(h)**     An endorsed/filed copy of the face page of the complaint or equivalent proof of commencement of litigation if applicable, or alternatively a certification under Section 5.1.

**(i)**     Social Security records, front or identifying face page and portions relevant to facts asserted in connection with the claim of deposition transcript(s), union records, railroad records, military records (including leave records), or any other employment records all highlighted and tabbed. If such records are unavailable, the claimant or representative attorney must explain why such records are unavailable and attest that every reasonable effort has been made to obtain them.

**(j)**     Information sufficient to establish that the claimant is not eligible nor has received Medicare benefits. Information representing that the date of last exposure to J.T. Thorpe, Inc. asbestos products or operations happened before or after December 5, 1980. Information of satisfied Medicare lien or global settlement documentation.

**6.3**     **Withdrawal of Claims.** A claimant may withdraw a Trust Claim at any time upon written notice to the Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based the date of such subsequent filing. A claim will be deemed withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six months of the Trust's offer of payment or rejection of the claim. Upon written request and good cause, the Trust may extend this period for an additional six months.

**6.4     Inactive Claim Status.**

Upon submission of a claim, claimant will have the opportunity to request that his/her claim be placed on "Inactive Claim Status". The Trust shall suspend any claim requesting Inactive Claim Status for up to two years and continued upon written request for good cause shown. Upon written request by the Claimant, a claim may be reactivated in the FIFO Processing Queue and proceed through normal evaluation procedures as established by the Trust pursuant to Section 5.7.

**6.5     Filing Fees.** There will be a filing fee of $250.00 for each unliquidated claim which will be refunded by the Trust if the claim is allowed. The Trust may waive the refundable filing fee if it is determined that such a fee would create undue financial hardship for the claimant. The size of the fee will be reviewed by the Trust on a yearly basis.

**6.6     Assignment of Direct Actions to the Trust.** Signature by an asbestos related claimant on his or her Compromise and Release, settling the claim, will constitute his or her assignment to the Trust of any Direct Action he or she might have against any Asbestos Insurance Company. Such signature will also authorize the Trust to act as his or her sole attorney in fact to prosecute any such Direct Action at the Trust's sole discretion.

## SECTION VII

### General Guidelines for Liquidating and Paying Claims

**7.1     Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.** Consistent with the provisions hereof and subject to the FIFO Processing and Liquidation Queues, Maximum Annual Payment, and Disease Category Claims Payment Ratio requirements set forth above, the Trustees shall proceed with due diligence to liquidate valid Trust Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient

resources to pay future valid claims in substantially the same manner.  Because the Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants.  However, the Trustees shall use his or her best efforts to treat similar claims in substantially the same manner, consistent with his or her duties as Trustees, the purposes of the Trust, the established allocation to Categories A and B, and the practical limitations imposed by the inability to predict the future with precision. In the event that the Trust faces temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the Futures Representative, suspend the normal order of payment and may temporarily limit or suspend payments altogether, and if appropriate, at any time may offer a Reduced Payment Option.

**7.2    Punitive Damages.**  In determining the value of any liquidated or unliquidated Trust Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system. Notwithstanding the foregoing, nothing in this Section 7.2 shall preclude holders of claims who opt out to the tort system pursuant to Section 5.11 of this TDP from pursuing punitive or exemplary damages in such actions, however, all payments to such claimholders on recoveries of punitive or exemplary damages shall be limited as set forth in Section 5.11.

**7.3    Suits in the Tort System.**  If the holder of a disputed claim disagrees with the Trust's determination regarding the Compensable Disease of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has either (i) first submitted the claim to non-binding arbitration as provided in Section 5.9 above and rejected the resulting arbitration award or (ii) rejected the Trust's offer and has his or her counter-offer accepted by the

-28-

Trust pursuant to Section 5.11 above, the holder may file a lawsuit in the jurisdiction where in personam jurisdiction over the Trust can be obtained. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class. No such lawsuit may be consolidated with any other lawsuit, with the exception of a personal injury or survival claim which may be consolidated with a wrongful death claim brought as a result of the death of the Injured Party. All defenses (including, with respect to the Trust, all defenses which could have been asserted by Thorpe) shall be available to the Trust at trial; however, the Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the earlier of the date on which the initial complaint was filed or the date the Trust Claim form was filed, the case will be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

      **7.4**    **Payment of Judgments for Money Damages.** If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO payment queue based on the date on which the judgment became final. Thereafter, the claimant shall receive from the Trust an initial payment (subject to the Payment Percentage, the Maximum Annual Payment, and Disease Category Claims Payment Ratio provisions set forth above) of an amount equal to one-hundred percent (100%) of the lesser of a) the jury award or b) the greater of (i) the Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration. The claimant shall receive the balance of the judgment, if any, in ten (10) equal installments in years six (6) through fifteen (15) following the year of the initial payment (also subject to the Payment Percentage, the Maximum Annual Payment, and Disease Category Claims Payment Ratio provisions set forth above). Under no circumstances shall interest be paid under otherwise applicable law on any judgments obtained in the tort system. The provisions of this Section 7.4

shall not apply to claim holders who pursue relief pursuant to the provisions of Section 5.11 above, as any payment to such claimholders is limited to the payment amount, if any, which such claimholders may be entitled to pursuant to Section 5.11(e).

**7.5     Releases.**  The Trustees shall have the discretion, with the consent of the TAC and Futures Representative, to determine the form and substance of the releases to be provided to the Trust in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the Trust.  The Release utilized by the Trust shall include all Personal Injury, Wrongful Death, and/or Derivative claims related to the Injured Party, with the exception of the Second Disease Claims, as described above in Section 5.8.  As a condition to making any payment to a claimant, the Trust shall obtain a general, partial, limited, or other release as appropriate in accordance with the applicable state or other law.  If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant shall constitute such a release.

**7.6     Third-Party Services.**  Nothing in this TDP shall preclude the Trust from contracting with another asbestos claims resolution organization to provide services to the Trust so long as decisions about the categorization and liquidated value of Trust Claims are based on the relevant provisions of this TDP, including the Compensable Diseases, Matrix Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth in the Matrix.

**7.7     Trust Disclosure of Information.**  Periodically, but not less often than once a year, the Trust shall make available to claimants and other beneficiaries, a statistical summary of the number of claims by Compensable Diseases that have been resolved by settlement, arbitration or trial by jurisdiction.

Exhibit A, page 062

## SECTION VIII

### Miscellaneous

**8.1**    **Amendments.**  Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided he or she first obtains the consent of the TAC and the Futures Representative pursuant to the Consent Process set forth in Sections 5.6 and 6.6 and, if necessary, Sections 5.7 and 6.7 of the Trust Agreement, except that the right to amend the Disease Category Claims Payment Ratio provisions set forth above) are governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.

**8.2**    **Severability.**  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP.  Should any provision contained in this TDP be determined to be inconsistent with or contrary to Thorpe's obligations to any insurance company providing insurance coverage to Thorpe in respect of claims for personal injury based on Thorpe Exposure, no payment shall be made by the Trust in respect of any such claim from proceeds from said insurance coverage.

**8.3**    **Governing Law.**  This TDP shall be governed by, and construed in accordance with, the laws of the State Nevada and without regard to the conflict of laws principles of such State.

**8.4**    **Attorneys' Fees.**  Attorneys' fees payable in connection with Trust claims paid through this TDP, whether based on hourly rates or where calculated as a percentage of recovery, shall be the lower of the fee provided in the contract between claimant and counsel or 25% of the

Exhibit A, page 063

recovery, exclusive of costs chargeable to the claimant, which costs shall be deducted from the gross amount paid before computation of fees. This recovery shall be measured by the actual payments from the Trust to the claimant, not the liquidated value of the claim. Legal fees shall be paid as payments to claimants are made by the Trust.

**8.5    Exception in California.** The holder of an asbestos claim who is a citizen of the State of California has the option to name the Trust as a party defendant. However, the Trust shall not participate in the litigation and shall be removed from all service lists. No payment shall be made to such holder of an asbestos claim except as provided by the Matrix and the TDP. In the event a California citizen opts to name the Trust in an action commenced in a California state court, the Trust shall not consent to remove the action to any federal court and if requested to do so, shall provide a declaration that it did not consent to any removal.

IN WITNESS WHEREOF, the Trustees of the J.T. Thorpe Settlement Trust have executed this J.T. Thorpe, Inc., a California corporation/J.T. Thorpe, Inc., a dissolved California corporation/Thorpe Holding Company, Inc., a California corporation/ Thorpe Technologies, Inc., a California corporation Asbestos Personal Injury Settlement Fourth Amendment to and Complete Restatement of Trust Distribution Procedures this 20th day of September, 2019.

TRUSTEES:

_____
Sandra R. Hernández, M.D.

_____
John F. Luikart

Consented to by:

FUTURES REPRESENTATIVE

_____
Hon. David F. Levi

TRUST ADVISORY COMMITTEE

By: _____
    Alan R. Brayton, Chair

Exhibit A, page 065

# EXHIBIT B



May 15, 2020

<u>SENT VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>
J.T. Thorpe Settlement Trust
Eve H. Karasik, counsel for the J.T. Thorpe Settlement Trust
Levene, Neale, Bender, Yoo & Brill, LLP
10250 Constellation Blvd. Suite 1700
Los Angeles, CA 90067

> **Re:    Request for Disclosure of Federally Required Information by Primary Payer
> J.T. Thorpe Settlement Trust ("Thorpe Trust")**

**To Eve H. Karasik:**

MSP Recovery, LLC, acting on behalf of MSP Recovery Claims, Series LLC, MSPA Claims 1, LLC, and MAO-MSO Recovery II, LLC, Series PMPI, (collectively, "MSP")—as assignees of Medicare claims from various health insurance companies, Medicare Advantage Organizations ("MAOs"), first-tier and downstream entities—has been designated by said health care organizations as a business associate, as defined by 45 C.F.R. § 160.103, to recover Medicare and Medicaid related medical benefits and payments made by their assignors that should have been paid, in the first instance, or reimbursed by primary payers in accordance with 42 U.S.C. § 1395y, *et seq.*, and 42 C.F.R. § 411.1, *et seq.* Primary payers include, but are not limited to, "workers' compensation, any liability or no-fault insurance . . . or self-insured plans."[1] The Thorpe Trust falls within this definition of primary payer.

Accordingly, to the extent a Medicare beneficiary[2] settles with the Thorpe Trust, the Thorpe Trust may have reimbursement obligations pursuant to the Medicare Secondary Payer Act. Our research indicates that the Thorpe Trust has failed to comply with the notice requirements as set forth in 42 C.F.R. § 411.25. This notice is also directed at any other affiliated entities or subsidiaries that are part of the Thorpe Trust's corporate or business structure that qualify as Responsible Reporting Entities (RRE) under the provisions of the Medicare, Medicaid, and SCHIP Extension Act (MMSEA) of 2007.

Pursuant to 42 C.F.R. § 422.108(f), MSP's Assignors exercise the same rights as Medicare. As such, MSP hereby asserts its rights to seek reimbursement as a contractually authorized Medicare assignee in all instances where your company, as a primary payer, failed to provide

---

[1] 42 C.F.R. § 411.24(b); *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1233 n. 1 (11th Cir. 2016) (stating a primary plan includes self-insured plans).

[2] Attached as Exhibit A, MSP provides the Thorpe Trust a representative sample of Medicare beneficiaries who have been diagnosed with asbestos-related illnesses. Please provide the requested information attached in Exhibit A to identify whether your fund provided settlement related to the asbestos-related illnesses.

---

Exhibit B, page 067

payment or appropriate reimbursement, and as a result of said failure, an MAO provided benefits to a Medicare beneficiary to the MAO's detriment.[3]

In a good faith effort to determine whether the Thorpe Trust has properly discharged its obligations, and to determine if primary payment was properly made, MSP Recovery conducted extensive due diligence. Among other things, MSP Recovery investigated bankruptcy and civil court dockets, identifying and reviewing publicly available pleadings and documents. MSP Recovery also reviewed public corporate and trust filings. Despite these efforts, MSP Recovery found a lack of transparency as it relates to the identity of the Thorpe Trust's claimants and settlements. Accordingly, this data appears to be exclusively in the possession of the Thorpe Trust.

Please provide us with notice (as required by 42 C.F.R. § 411.25) describing the specific situation and the circumstances surrounding any payment made by the Thorpe Trust to the beneficiaries identified in Exhibit A. The documentation sought herein is mandated by federal law, federal code, and CMS requirements.[4] In order to comply with the Health Insurance Portability and Accountability Act ("HIPAA"), we have established a secure FTP site for data sharing. Please visit www.msprecovery.com/disclosure and enter the following code [ABkh2%8]hA53] within ten calendar days of your receipt of this letter. This website will contain a preliminary list of instances that MSP is determining whether the Thorpe Trust is required to reimburse medical expenses.[5] Please upload the documents containing the requested information, and information related to any other affiliated entities that are part of the Thorpe Trust's corporate or business structure that would be defined as a RRE, within 30 calendar days of the date of this letter.

If you have any additional questions or concerns regarding this request, please do not hesitate to contact the undersigned via email at asbestos@msprecovery.com.

Respectfully,

/s/ *Jorge Lopez*

Jorge Lopez
Corporate Representative

---

[3]  *See Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1239 (11th Cir. 2016) (holding that a "plaintiff is entitled to summary judgment on a § 1395y(b)(3)(A) claim when there is no genuine issue of material fact regarding (1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) the damages amount.").

[4] *See* 42 U.S.C. § 1395y, *et seq*. and 42 C.F.R. § 411.1, *et seq*.

[5] The information available in the portal neither contains Protected Health Information ("PHI") or confidential information and is readily available to the public. It has only been customized to provide information specifically related to your trust.

EXHIBIT C

## Schiff Hardin

Schiff Hardin LLP
4 Embarcadero Center
Suite 1350
San Francisco, CA  94111

T 415.901.8700
F 415.901.8701

schiffhardin.com

June 17, 2020

**Jeanine M. Donohue**
(415) 901.8644
jdonohue@schiffhardin.com

**VIA EMAIL: ASBESTOS@MSPRECOVERY.COM**

Jorge Lopez
Corporate Representative
MSP Recovery
2701 South LeJeune Road
10th Floor
Coral Gables, FL 33134

Re:  J.T. Thorpe Settlement Trust

Dear Mr. Lopez,

We are in receipt of your letter dated May 15, 2020 addressed to Eve Karasik at Levene, Neale, Bender, Yoo and Brill, LLP.  I am outside General Counsel to the J.T. Thorpe Settlement Trust.

Preliminarily, we did not receive the Exhibit A that you reference in the second full paragraph on page 2 of your letter.

Upon review of your request, the information you are requesting is subject to the Trust's Third Party Disclosure Policy (http://jttstrust.com/third-party-disclosures).  The Trust's policy states that any claim settlement and payment amount is confidential.  Please refer to the Trust's Third Party Disclosure Policy for any further questions.

Additionally, the J.T. Thorpe Settlement Trust was established as a Qualified Settlement Fund ("QSF") under 26 CFR Section 468B-1 on June 29, 2006.  The currently published guidance on the subject of identification of a Responsible Reporting Entity (RREs) by the Center for Medicare and Medicaid Services has made it clear that settlement trusts, such as this QSF, are not RREs.

Based on the above, the J.T. Thorpe Settlement Trust will not be responding to your written request.

Very truly yours,

Jeanine M. Donohue

JMD:da

SF\322192909.1

# EXHIBIT D



Jai H. Kim
Attorney at Law
jkim@shulmanbastian.com

Please reply to Irvine

James C. Bastian, Jr.
Shane M. Biornstad*
Lynda T. Bui
Bryan W. Cabrera
Franklin J. Contreras, Jr.
Melissa Davis Lowe
Alan J. Friedman**
Kiara W. Gebhart
J. Ronald Ignatuk
Brandon J. Iskander
Rika M. Kido
Jai H. Kim
Ryan D. O'Dea
Gary A. Pemberton
Leonard M. Shulman
Sarah M. St. John

————

Of Counsel to the Firm
Jeffrey W. Broker
Michael J. Petersen***
A. Lavar Taylor

*Also admitted to
practice in Nevada

**Also admitted to
practice in Texas

***Also admitted to
practice in Wisconsin;
Minnesota and Illinois

December 9, 2020

<u>Via E-Mail and First Class Mail</u>
<u>EHK@lnbyb.com</u>

Eve H. Karasik
LEVENE, NEALE, BENDER, YOO & BRILL LLP
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067

Re:      <u>Meet and Confer re FRBP 2004 Production of Documents</u>
         Case No. 2:07-bk-20016-BB (Jointly Administered with 2:07-bk-19271-BB)

Debtors:   Thorpe Insulation Company, a California corporation and Pacific Insulation
           Company, a California corporation

Dear Ms. Karasik:

     Pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 2004 and Local Bankruptcy Rule 2004-1(a), please allow this letter to serve as our formal request for a conference to arrange for a mutually agreeable date, method, and scope of production of documents under FRBP 2004.

     Our office represents MSP Recovery Claims, Series LLC, MSPA Claims 1, LLC, MAO-MSO Recovery II, LLC, and MSP Recovery Claims Series 44, LLC (together "Clients"), assignees of recovery rights from numerous Medicare Advantage plans, first tier entities, and downstream entities[1] that are "secondary payers" with recovery rights under, *inter alia*, the Medicare Secondary Payer provisions of the

———————

[1] A first tier entity is any party that enters into a written arrangement, acceptable to the Centers for Medicare and Medicaid Services ("CMS"), with a Part D plan sponsor or applicant to provide administrative services or health care services for a Medicare eligible individual under Part D. Downstream entity means any party that enters into a written arrangement, acceptable to CMS, below the level of the arrangement between a Part D plan sponsor (or applicant) and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services. 42 C.F.R. § 423.501(3).

100 Spectrum Center Drive, Suite 600, Irvine, CA 92618 • Tel: 949.340.3400 • Fax: 949.340.3000
3550 Vine Street, Suite 210, Riverside, CA 92507 • Tel: 951.275.9300 • Fax: 951.275.9303
www.shulmanbastian.com

Exhibit D, page 072

Eve H. Karasik
December 9, 2020
Page 2

Medicare Act, 42 U.S.C. § 1395y(b), et seq., including 42 U.S.C. § 1395y(b)(3)(A) (collectively, the "MSP Law"). Our Clients identified Medicare beneficiaries that received medical benefits from their assignors for the treatment of asbestos related illnesses (the "List") for which they may be entitled to reimbursement from the Thorpe Insulation Company Asbestos Settlement Trust (the "Trust").[2]

Our Clients' understanding is that the Trust has paid, and continues to pay, "Trust Claims" to asbestos claimants under the applicable Thorpe Insulation Company Asbestos Personal Injury Settlement Trust Distribution Procedures ("TDP"), many of whom are Medicare Advantage plan beneficiaries. Our Client's initial due diligence indicates that a number of asbestos claimants processed as "Trust Claims" also seem to appear on the List.[3]

**Document Production**

Enclosed with this letter is a list of documents our Clients will need to further investigate their rights under the MSP Law and other applicable laws. The document request is based on our review of the annual report and accounting filed recently filed with the Bankruptcy Court.

Item No. 1

Note 4 to the Thorpe Insulation Settlement Trust Financial Statements December 31, 2019 and 2018 filed with the Tenth Annual Report and Accounting [Exhibit A to Docket No. 158] ("Financial Statements") provided that:

"The Trust processed and approved approximately $14,463,000 and $11,868,000 of Trust Claims during the years ended December 31, 2019 and 2018, respectively."

Exhibit B to Docket No. 158, under the paragraph "Trust Claims," provided that during 2019, there were 777 claims received, with 170 offers issued to claimants,

---

[2] In the case of liability insurance settlements . . . the following rule applies: If Medicare is not reimbursed as required by paragraph (h) of this section, the primary payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party. 42 C.F.R. § 411.24(i)(1). Pursuant to 42 C.F.R. § 422.108(f), an MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations.

[3] The requested documents are crucial in determining our Clients' rights as most, if not all, of asbestos claims against the Trust are handled privately outside of the court in accordance with TDP.

Eve H. Karasik
December 9, 2020
Page 3

with 184 claims paid. As of December 31, 2019, the total amount paid for Trust Claims was $237,856.260.

Our Clients seek to cross-reference the List with the processed and approved Trust Claims.  As noted in the Enclosure, the applicable period for the document production is from January 1, 2005 to the present.

Items No. 2, 3 and 4

On Page 5, Line 24 of the Tenth Annual Report and Accounting, the Trust attested that:

> "Section 2.2(b) of the Trust Agreement requires the Trustees to file income tax and other returns and statements in a timely manner, and comply with all withholding obligations as legally required, including fulfilling requirements to maintain the Trust's status as a Qualified Settlement Fund."

Note 8 to the Financial Statements stated that "[f]or federal income tax purposes, the Trust is taxed as a Qualified Settlement Fund (QSF)." It is our understanding that the following conditions must be met for each year the Trust files IRS Form 1120-SF:

- Governmental order or approval requirement,

- Resolve or satisfy requirement, and

- Segregation requirement.

Our Clients seek to confirm that the Trust has fulfilled its obligations to maintain its status as QSF for the years in question, and to confirm that the Trust's reporting obligations under Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 and/or 42 C.F.R. § 411.25.

We would be more than happy to speak with you regarding the scope of documents requested and the necessary handling issues.

## **Manner of Production**

We propose that the Rule 2004 production of documents be provided either electronically or via physical copies delivered to our Irvine Office located at 100 Spectrum Center Drive, Suite 600, Irvine, California 92618 no later than January 11, 2021. Please advise if the above date is feasible for the Debtor. If not, let's discuss this over the phone to set a mutually agreeable date.

Eve H. Karasik
December 9, 2020
Page 4

Please get back to me no later than **December 17, 2020** via telephone at (949) 340-3400 or via email at jkim@shulmanbastian.com to arrange for a mutually agreeable date, method, and scope of the Rule 2004 production of documents. If we do not hear from you by **December 17, 2020**, we will have no choice but to move forward with a motion to compel examination and production.

Notwithstanding the formality of this letter, if you are willing to provide the above requested documents informally, we can certainly arrange in short order.

Thank you in advance for your cooperation.

Very truly yours,

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**

*Jai H. Kim*
*[Electronic Signature]*

Jai H. Kim

JHK

Enclosure

cc:    Lynda T. Bui
       Leonard M. Shulman

## 2004 Examination of Documents Request Items[1]

1.     For each claimant who submitted an asbestos exposure related claim to the Trust, and received any form of payment from the Trust (*i.e.*, Trust Claims pursuant to TDP), provide in electronic format the following data fields relating to each claimant:

      a.  full name;
      b.  date of birth;
      c.  gender;
      d.  Medicare HIC number (HICN);
      e.  Medicare Beneficiary Identifier (MBI);
      f.  Social Security number;
      g.  telephone number;
      h.  address, including county, state, city, and zip code;
      i.  date of payment; and
      j.  amount of the Trust Claim distribution.

If the Trust does not maintain the data sought in electronic format, provide any such documents maintained by the Trust containing the information sought, including, but not limited to, claim forms and settlement agreements.[2]

2.     For those claimants identified in response to request number one, provide documentation demonstrating the Trust's compliance with the mandatory reporting obligations to the Centers for Medicare and Medicaid Services, pursuant to Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA") and/or 42 C.F.R. § 411.25.

3.     To the extent that the Trust relies on an exemption to its reporting requirements under MMSEA due to its purported status as a Qualified Settlement Fund pursuant to 26 U.S.C. §468B, provide:

      a.  All tax forms, including schedules, filed on behalf of the Trust for tax years 2005 through 2011.

      b.  All correspondence between the Trust and the Internal Revenue Service relating to the Trust's tax filings for tax years 2005 through 2011.

4.     All correspondence between the Trust, the Debtors and/or any governmental agency regarding Trust's status as Qualified Settlement Fund.

---

[1] Our Clients are prepared to enter into a HIPAA compliant confidentiality agreement to ensure the privacy of any exchanged protected health information, as defined in 45 C.F.R. § 160.103.

[2] For any such individual, if you do not have all of the information requested, please provide as much information in your possession, custody and/or control.

# EXHIBIT E



December 21, 2020

<u>Via Electronic Mail</u>

Jai H. Kim, Esq.
Shulman, Bastian, Friedman
& Bui LLP
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618

   Re: <u>Meet and Confer re FRBP 2004 Production of Documents</u>

Dear Mr. Kim:

   This correspondence is in response to your "*Meet and Confer re FRBP 2004 Production of Documents*" letters dated December 9, 2020 sent to the Thorpe Insulation Company Asbestos Settlement Trust (the "<u>Thorpe Insulation Trust</u>") and the J.T. Thorpe Settlement Trust (the "<u>J.T. Thorpe Trust</u>" and with the Thorpe Insulation Trusts, the "<u>Trusts</u>")  (the "<u>Letters</u>").  In the Letters, you state that your clients are "assignees of recovery rights from numerous Medicare Advantage plans, first tier entities, and downstream entities [footnote omitted] that are 'secondary payers' with recovery rights under, *inter alia*, the Medicare Secondary Payer provisions of the Medicare Act, 42 U.S.C. section 1395y(b), et seq." Your further state that your clients are seeking the production of documents (the "<u>Document Request</u>") in order to "further investigate their rights under the MSP [Medicare Secondary Payor] Law and other applicable laws . . . ." There are several fundamental and practical flaws in your request and your attempt to use Federal Rule of Bankruptcy Procedure 2004 ("<u>Rule 2004</u>") in this manner as enumerated below.

***The Document Request Seeks Documents for Claimants Not Subject to the Secondary Payor Provisions of the Medicare Act***

   Your clients' document production request is overly broad and seeks information and documents beyond the scope of the Medicare Secondary Payer provisions of the Medicare Act that you rely upon.  These provisions were not effective until December 5, 1980.  *See* 42 U.S.C. §1395y(b) and Section 4-1, MMSEA Section 111 Medicare Secondary Payer Mandatory Reporting Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation USER GUIDE Chapter III: POLICY GUIDANCE Version 6.1 Rev. 2020/ 10 November COBR-Q4-2020-v6.1 (the "<u>MMSEA Section 111 User Guide</u>").  The Centers for Medicare and Medicaid Services ("<u>CMS</u>"), the agency charged with administering the Medicare Act, has determined that where

EVE H. KARASIK ATTORNEY AT LAW  ■  EMAIL: EHK@LNBYB.COM  ■  DIRECT: 310.229.3350

10250 CONSTELLATION BLVD., STE 1700, LOS ANGELES, CA 90067  ■  TEL: 310.229.1234  FAX: 310.229.1244  WWW.LNBYB.COM  Exhibit E, page 078

Jai H. Kim, Esq.
December 21, 2020
Page 2

payments have been on made behalf of a particular company for asbestos claims where the exposure to that companies' products or operations was prior to December 5, 1980, those payments are not subject to the Secondary Payer provisions you have cited. *Id.* at 6-22-24. If CMS is not entitled to receive reimbursement for claims arising from exposure prior to December 5, 1980, then your clients, as assignees of such reimbursement rights, will also have no right to such reimbursement.

Both Trusts are Bankruptcy Code section 524(g) trusts that were created through the confirmation of chapter 11 plans in bankruptcy cases. As set forth in the Chapter 11 confirmation pleadings and documents, both Trusts were established for companies that performed many of their asbestos operations or sold asbestos products for significant periods prior to December 5, 1980. While the Trusts do not have a business reason to separately track claimed exposure dates in relation to December 5, 1980, their experience has shown that many of the Trusts' claim payments relate only to claimed exposures prior to that date.[1]

The Trusts' claim administrative process is governed by the Bankruptcy Court approved their respective Trust Distribution Procedures (the "TDP") and Case Valuation Matrix (the "Matrix"). Pursuant to the TDP and Matrix, the Trusts only collect information necessary for the Trusts to evaluate and value each claim. The Trusts pay claims based upon the claimed exposure to the companies' asbestos operations or asbestos products. The collected information used by the Trusts to evaluate and pay the claims is included in proprietary case processing systems ("Claims Systems"). While the Claims Systems capture the claimed exposure history relied upon by the Trusts to pay claims, the data is not organized and the Trusts do not have the internal programming capabilities to select just those claimants whose claimed exposure is on or after December 5, 1980. The Trusts would be required to pay an outside vendor to do this programming and reporting as described below.

Even if your data request was appropriate, which it is not, the fees and costs for all professionals to segregate and review this data would have to be paid in advance. Moreover, because this would be an additional programming request to a vendor who has other clients and commitments, the Trust does not know how soon this work could be done, quality controlled and completed.

---

[1] Thorpe Insulation Company began operations in 1948. (*See* First Amended Disclosure Statement Concerning The First Amended Joint. Plan Of Reorganization Of Thorpe Insulation Company And Pacific Insulation Company Under Chapter 11 Of The Bankruptcy Code, page 5. J.T. Thorpe Company began operations in 1932. (*See* Disclosure Statement for Joint Plan of Reorganization Dated February 25, 2005, page 11.)

LNBY&B

Jai H. Kim, Esq.
December 21, 2020
Page 3

Moreover, before any claimant's personal private confidential information could be produced by the Trust, the Trust procedures require that the Trust notify claimants and provide them an opportunity to object to the production of such information.

**The Trusts Are Qualified Settlement Funds and are Not Responsible Reporting Entities**

As your letter anticipated, the Trusts are qualified settlement funds within the meaning of section 468B of the Internal Revenue Code ("QSF"). *See* Order Confirming First Amended Plan of Reorganization Dated August 5, 2005 and Granting Related Relief at page 5 for the J.T. Thorpe Trust and Order Confirming Sixth Amended Joint Plan of Reorganization of Thorpe Insulation Company and Pacific Insulation Company filed May 8, 2013 at page 5 for the Thorpe Insulation Trust.   We can also confirm that the Trusts have filed Form 1120-SF, U.S. Income Tax Return for Settlement Funds, each year since their formation.[2]

QSF's are not Responsible Reporting Entities under the Medicare, Medicaid and SCHIP Extension Act of 2007 (the "MMSEA"). 42 U.S.C 1395y(b)(8)  *See* Section 6.5, MMSEA Section III User Guide ("(Note: QSFs under Section 468B of the IRC are not RREs.)"). Accordingly, the Trusts, as QSFs, are not Responsible Reporting Entities.

**The Document Request Seeks Confidential Private Personal Information From Court Appointed Fiduciaries Without any Showing that Your Clients Have Paid Anything for Any Trust Beneficiary Whose Asbestos Exposure Occurred On or After December 5, 1980**

You have offered to enter into a "HIPAA compliant confidentiality agreement to ensure the privacy of any exchange protected health information, as defined in 45 C.F.R. §160.103." *See*, footnote 1 to Document Request.  We appreciate that you recognize that the Trusts have in their possession confidential information regarding their beneficiaries. However, your clients are third party private entities with no relationship to the Trusts. Your clients have no right to receive any of the Trusts' beneficiaries' confidential information unless your clients' assignors made a payment on behalf of a specific individual who has also been paid by the Trust.   Your clients' desire to create a cross reference "List" does not give your clients any right to obtain confidential information from the Trusts for individuals unrelated to those where your clients are assignees of

---

[2] Your request for all of the Trusts' tax records and correspondence is overly broad and seeks confidential information.  You have demonstrated no compelling need for such additional tax documents.  The Trusts' financial statements prepared by their independent certified public accountants, which are attached to each annual report filed in the Bankruptcy Cases, are of public record and of provide ample financial information for the Trusts.



Jai H. Kim, Esq.
December 21, 2020
Page 4

some claim. Without any foundation that your clients' assignors are entitled to the confidential information of any Trust beneficiary and that particular claim has been assigned to your clients, your offer to enter into a confidentiality agreement and your clients' rights as a generic assignee of purported Secondary Payors do not create a right for your clients to receive such information.

### The Significant Burden of the Overly Broad Document Request

Finally, of extreme importance to the Trusts is the significant burden and expense that the Document Request imposes on the Trusts.  Even though the requests are few in number the work necessary to identify the responsive data is significant for several reasons. First, the sheer volume of claims paid by the Trust creates a burden (JT Thorpe Trust has paid approximately 7,500 claims inception to date; the Thorpe Insulation Trust has paid almost 10,000 claims inception to date). The Trusts' goal is to maximize recoveries for their claimant beneficiaries who have suffered from serious disease and in many instances death. In order to reduce the Trusts' administrative costs so there are more funds for beneficiaries, the Trusts share four individuals (employed by another Bankruptcy Code section 524(g) Trust) who review and handle claims with one shared Claims Director.

As described above, the Trusts' Claims Systems have reporting capabilities for the purposes of evaluating and processing claims pursuant to the Trusts' TDP and Matrix. However, the reporting capability does not extend to preparing queries and reports in the form necessary to respond to all aspects of the Document Request.  Moreover, the Trusts used a different legacy claims processing system for the first decade of their existence. There was no reason for the Trusts to import all of the information from the legacy system to the current system for claims that had already been paid.  Further, none of the individuals working with the Trusts have the expertise to write and test the programs that would be necessary to retrieve all of the information requested from the legacy system or the Claims Systems. Moreover, to do the processing by hand would mean that the Trusts would have to curtail its primary function of processing and paying the claims of individuals injured by the operations and products of the companies for whom the Trusts were created, which the Trusts are not prepared to do. Therefore, if the Trusts were to respond to the Document Request, the Trusts would have to incur the burden and expense of having a vendor create the necessary programs both for the legacy system and the Claims Systems, and then test these programs to confirm that they are reliable before being able to retrieve information responsive to the Document Request. Your clients do not propose to pay for the cost of the necessary document retrieval process required.[3]

---

[3]     The Trusts' TDP and Matrix require that images of numerous documents be submitted in support of claims (*e.g.,* interrogatories, depositions, social security records, medical records).

LNBY&B

Jai H. Kim, Esq.
December 21, 2020
Page 5

**_Improper Use of Rule 2004 In This Context_**

Your clients have proposed that they will use Rule 2004 to obtain the requested documents if the Trusts do not provide the requested documents informally. However, Rule 2004 is not available to your clients. As an initial matter, the Chapter 11 plans of J.T. Thorpe, Inc. and Thorpe Insulation Company (the "Debtors") were confirmed years ago, and the "estate of the debtor[s] cease[d] to exist upon confirmation." *In re ACandS, Inc.*, 2011 WL 3471243, at *2 (Bankr. D. Del. Aug. 8, 2011). As a result, the scope of Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004") is narrowed, and the requested documents cannot be obtained pursuant to Rule 2004. The court in *In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373 (Bankr. E.D. Pa. 1988) stated:

> "[A] 2004 examination is generally a pre-confirmation discovery tool. Nonetheless, the broad language of Rule 2004(b), referring to "any matter which may affect the administration of the debtor's estate," the "source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan," and "any other matter relevant to the case" allows, in a **_narrow context_**, the use of Rule 2004 post-confirmation. **_The examination, though, must be limited to issues which the court, at that time, still has the power to entertain. That is, it is restricted to the administration of the case post-confirmation._** The binding effect of confirmation upon debtors and creditors alike under 11 U.S.C. § 1141 . . . makes the primary purpose of a 2004 examination inapplicable. Yet, the use of such a discovery tool to obtain information relevant to the continued administration of the case post-confirmation, such as a possible motion under **_§§ 1112, 1127, 1142 or 1144_**, is supportable, if so limited."

*Id*. at 377–78 (emphasis added). *See also In re Express One International, Inc.,* 217 B.R. 215, 216–17 (Bankr. E.D. Tx. 1998) (in a post-confirmation case, stating that a Rule 2004 examination is limited to those matters relating to the administration of the case, and that the court "has the power to entertain.").

---

The Trusts capture in the Claims Systems data fields that information necessary for the Trusts to evaluate and pay claims. There is undoubtedly other information contained in those documents some of which may be responsive to the Document Request. The Trusts have no capacity to review what could be hundreds or even thousands of pages per claimant to see if those records might have some of the requested information. For claims that were filed under the legacy system, it would be even more difficult because during that period claimants submitted large image files that contained all the supporting documents rather than breaking them up into specific categories (*e.g.,* medical, work history). The burden to review these older images will be significant.

LNBY&B

Jai H. Kim, Esq.
December 21, 2020
Page 6

Here, the discovery that your clients are seeking is outside the scope of, and/or cannot be obtained through Rule 2004 for several reasons.

First, your clients' post-confirmation investigation of their rights under the "MSP Laws" has nothing to do with the administration of the Debtors' plans and cases to justify the application of Rule 2004.  Specifically, your clients are not seeking to modify the plans, revoke the confirmation orders, or to "seek compliance with the terms of the confirmed plan[s] or to have the case[s] dismissed or converted to chapter 7."  *See id*. at 378-79.

Further, your clients are alleged to be "secondary payors" with certain recovery rights against parties, which do not include the Trusts as the Trusts are QSFs and are not Responsible Reporting Entities. Rule 2004 cannot be used by your clients in an attempt to "identify another entity [that it] might be able to collect from."  *See In re J&R Trucking, Inc.*, 431 B.R. 818, 822-823 (Bankr. N.D. Ind. 2010) ("As for movants' desire to identify third parties who may also be liable to them, that, quite simply is neither this court's concern nor the purpose of Rule 2004 . . . . No Matter how artfully one tries to disguise the requested examinations, by dressing them up in robes of bankruptcy administration, their real purpose is to identify another entity movants might be able to collect from, and whether those efforts would have any impact on the bankruptcy estate is of no real concern to them.").[4]

Moreover, as you are aware, the purpose of Rule 2004 is generally to "provide the Trustee [or other interested parties] . . . a very broad discovery device to aid in an efficient and expeditious ingathering of all of the pertinent facts necessary in the effective administration of the estates . . . . [and i]t is not intended to give the rehabilitated debtor post confirmation a strategic advantage in fishing for potential private litigation."  *In re Good Hope Refineries, Inc.*, 9 B.R. 421, 423 (Bankr. D. Mass. 1981).  Although in certain circumstances, it may be proper for a bankruptcy or liquidating trustee to use Rule 2004 to obtain information about potential claims that a debtor may hold or bring against third parties, this is not the case here.  Putting aside the fact that there is no trustee seeking to use Rule 2004 to investigate litigation claims, the purpose of the post-confirmation 524(g) Trusts is not to commence litigation or to recover assets for creditors, but instead to "provide for mechanisms ensuring [their] value and pay present and future claimants in substantially the same manner."  *See also id*. *In re J T Thorpe Co.*, 308 B.R. 782, 791 (Bankr. S.D. Tex. 2003) ("The principal purpose of the Plan is implementation of an

---

[4] To the extent that your clients are attempting to use Rule 2004 to seek information regarding "private litigation" regarding your client, on the one hand, and another third party, this is also inappropriate.  *In re Good Hope Refineries, Inc.*, 9 B.R. 421, 421 (Bankr. D. Mass. 1981).



Jai H. Kim, Esq.
December 21, 2020
Page 7

orderly process, utilizing Section 524(g) of the Bankruptcy Code, to compensate legitimate Asbestos Claimants fairly, while preserving the Debtor's business.").

To the extent that your clients are considering filing an adversary proceedings against the Trusts in the Bankruptcy Court, upon the actual filing of such action, we can discuss whether such discovery is appropriate in that context, but Rule 2004 is not the proper procedural vehicle. *See In re Coffee Cupboard, Inc.*, 128 B.R. 509, 516 (Bankr. E.D.N.Y. 1991) ("Rule 2004 examinations should not be used to obtain information for use in an unrelated case or proceeding pending before another tribunal."); *In re Bellville*, No. 00-11144, 2002 WL 31761279, at *3 (Bankr. D. Vt. Aug. 9, 2002) ("This Court will not enter an Order which permits the movant to thwart the adversary proceeding rules and obtain through a Rule 2004 examination of Mr. Baker in the debtor's chapter 13 case what it cannot obtain from Mr. Baker in the context of the discovery permitted in the adversary proceeding."); *In re GHR Energy Corp.*, 35 B.R. 534 (Bankr. D. Mass. 1983) (moving party cannot use "rule 2004 to circumvent the procedural safeguards provided litigant by the Federal Rules of Civil Procedure[.]".

In the abundance of caution and in order to preserve any objections, please be apprised that the Trusts object to the Letters' document production request and the attempt to obtain the requested documents using Rule 2004. We look forward to discussing these issues with you at our telephonic meet and confer set forth December 23, 2020 at 11:00 a.m.

Very truly yours,

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

By:_____
    EVE H. KARASIK,
    A Partner of the Firm

cc:    Steve Bray, Esq.
       Gary Fergus, Esq.
       Jeanine Donohue, Esq.

# EXHIBIT F

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
LAW OFFICES



July 6, 2021

<u>Via Electronic Mail</u>

Alan J. Friedman
Shulman, Bastian, Friedman
& Bui LLP
100 Spectrum Center Drive,
Suite 600
Irvin, California 92618

Re:  Litigation Against the J.T. Thorpe Settlement Trust

Dear Alan,

I write in response to your clients' June 11, 2021 correspondence with attached draft Complaint that seeks double damages against the J.T. Thorpe Settlement Trust (the "Trust").  As a condition to avoid the threatened litigation, your clients have (1) insisted that the Trust surrender personal confidential information of Trust beneficiaries without any showing by your clients' that the Trust has made a single payment of Medicare-covered expenses on behalf of any Trust beneficiary; and (2) demanded that the Trust voluntarily assume regular reporting obligations not required by the facts or law with regard to the Trust.  I am sure you and your clients are aware both that the Trust's assets are protected by injunctions arising under 11 U.S.C. Section 524(g) against any unauthorized claims and that there are significant consequences for the violation of those injunctions.

We have carefully considered the draft Complaint, which contains both factual errors, and erroneous legal conclusions.  In the Trust's December 21, 2020 letter response to your client's prior threat of an examination under Rule 2004 of the Federal rules of Bankruptcy Procedure, the Trust described in general terms the factual and legal basis for the Trust's fiduciary obligation to decline to comply with your clients' unwarranted demands.  The draft Complaint ignores the factual and legal issues raised by the Trust in the December 21, 2020 letter (the "Letter").

We also have examined your clients' litigious history throughout the United States in connection with Medicare Secondary Payments.   It appears that your clients' business model is to sue regardless of the particular facts and law.

Accordingly, from the Trust's perspective, it therefore seems useless to try to explain further the applicable facts and law, including the facts and law regarding, but not limited to, the Trust's confidentiality obligations to its claimants and its lack of Medicare registration and reporting obligations, as made clear in the relevant agency and

L N B Y & B

governmental guidance documents applied to Section 524(g) trusts and as summarized in the Letter.

Should your clients continue on this litigation path, the Trust reserves any and all rights that it may have in response.

Very truly yours,

*Eve H. Karasik*

Eve H. Karasik

Cc: Steve Bray, Esq.
    Gary Fergus, Esq.
    Jeanine Donohue, Esq.

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Please see attachment | **DEFENDANTS**<br>Please see attachment |
|---|---|

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Please see attachment | **ATTORNEYS** (If Known)<br>Please see attachment |
|---|---|

| **PARTY** (Check One Box Only)<br>□ Debtor        □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor      ☒ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>□ Debtor        □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor      ☒ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Plaintiffs assert causes of action for (1) declaratory relief pursuant to 28 U.S.C. Section 2201, 42 U.S.C. Section 1395y(b)(8) and 42 C.F.R. Section 411.25 seeking a declaration that Defendant Trust is a primary plan with reporting obligations and (2) a private cause of action for damages pursuant to 42 U.S.C. Section 1395y(b)(3)(A) for the Trust's failure to provide for primary payments or reimbursement to Plaintiffs for their Medicare payments.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- □ 11-Recovery of money/property - §542 turnover of property
- □ 12-Recovery of money/property - §547 preference
- □ 13-Recovery of money/property - §548 fraudulent transfer
- ☒ 2 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- □ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- □ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- □ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- □ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- □ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- □ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- □ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- □ 61-Dischargeability - §523(a)(5), domestic support
- □ 68-Dischargeability - §523(a)(6), willful and malicious injury
- □ 63-Dischargeability - §523(a)(8), student loan
- □ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- □ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- □ 71-Injunctive relief – imposition of stay
- □ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- □ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- □ 1 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- □ 01-Determination of removed claim or cause

**Other**
- □ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- □ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $   Unknown at this time. |

Other Relief Sought

1. Declaratory Relief    2. Money Damages

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br><br>J.T. Thorpe, Inc. | BANKRUPTCY CASE NO.    2:02-bk-14216-BB &<br>LA-02-14216-BB Jointly Administered Under LA-02-14216-BB | |
| DISTRICT IN WHICH CASE IS PENDING<br><br>Central District of California | DIVISION OFFICE<br><br>Los Angeles | NAME OF JUDGE<br><br>Hon. Sheri Bluebond |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>  /s/ Gary A. Pemberton | | |
| DATE<br><br>July 13, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>  Gary A. Pemberton | |

## INSTRUCTIONS

        The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

        A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

        The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## ATTACHMENT TO ADVERSARY COVER SHEET

| | |
|---|---|
| **PLAINTIFFS** | **DEFENDANTS** |

**PLAINTIFFS**

MSP RECOVERY CLAIMS, SERIES LLC, a Delaware Series Limited Liability Company

MSPA CLAIMS 1, LLC, a Florida Limited Liability Company

MAO-MSO RECOVERY II LLC, SERIES PMPI, a Segregated Series of MAO-MSO Recovery II LLC, a Delaware Series Limited Liability Company

MSP RECOVERY CLAIMS SERIES 44, LLC, a Delaware Series Limited Liability Company

**DEFENDANTS**

THE J.T. THORPE SETTLEMENT TRUST, a Nevada Trust

JOHN F. LUIKART, Co-Trustee of the J.T. Thorpe Settlement Trust

SANDRA R. HERNANDEZ, M.D., Co-Trustee of the J.T. Thorpe Settlement Trust.

**ATTORNEYS**
Alan J. Friedman - Bar No. 132580
Gary A. Pemberton - Bar No. 126159
**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone: (949) 340-3400
Facsimile: (949) 340-3000
Email: AFriedman@shulmanbastian.com
          GPemberton@shulmanbastian.com

Frank C. Quesada - Florida Bar No. 29411
Robert Strongarone - Florida Bar No. 118931
Aida M. Landa - Florida Bar No. 136451
**MSP RECOVERY LAW FIRM**
2701 S. Le Jeune Road, 10th Floor
Coral Gables, Florida 33134
Telephone: (305) 614-2222
Email: fquesada@msprecoverylawfirm.com
          strongarone@msprecoverylawfirm.com
          alanda@msprecoverylawfirm.com

**ATTORNEYS**
Eve H. Karaski, Esq.
**LEVEN, NEALE, BINDER, YOO & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, CA  90067
Telephone:  (310) 229-1234
Facsimile:  (949) 229-1244
Email: ehk@lnbyb.com